Filed 10/24/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>    v.<br><br>ADAM AKHTAR MALIK,<br><br>       Defendant and Appellant. | C080291<br><br>(Super. Ct. Nos. CRF142201,<br>CRF145154) |

APPEAL from a judgment of the Superior Court of Yolo County, Paul K. Richardson, Judge. Affirmed.

Michael B. McPartland, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez and Kari Ricci Mueller, Deputy Attorneys General, for Plaintiff and Respondent.

---

[*] Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II.

Defendant Adam Akhtar Malik was convicted by jury of assault with a deadly weapon (Count 2) and making a criminal threat (Count 3).[1] With respect to the latter count, the jury found defendant personally used a deadly or dangerous weapon. With respect to both, the jury found defendant personally inflicted great bodily injury on the victim. The trial court sentenced defendant to serve seven years in state prison.[2]

On appeal, defendant contends: (1) the trial court abused its discretion and violated his federal constitutional rights by allowing the prosecutor to cross-examine his expert witness, a psychologist who testified defendant suffered from post-traumatic stress disorder (PTSD), concerning her review of several police reports; and (2) the trial court violated Penal Code[3] section 654 by imposing and executing sentence on both counts of conviction because these offenses were committed with the same intent and objective.

We affirm. As we shall explain, while we conclude the trial court abused its discretion and violated defendant's confrontation rights by allowing the prosecutor to relate case-specific testimonial hearsay from the police reports to the jury during her cross-examination of the defense expert, the error was harmless. We reject defendant's claim the trial court was required to stay execution of sentence on the criminal threats conviction under section 654.

---

[1] The jury found defendant not guilty of attempted murder (Count 1) and the lesser included offense of attempted voluntary manslaughter.

[2] These charges also served as the basis for a petition to revoke the probation defendant had been granted in a separate case. The petition was granted and defendant was sentenced to serve a concurrent term of two years four months in that matter.

[3] Undesignated statutory references are to the Penal Code.

FACTS

In October 2014, defendant lived at a Motel in West Sacramento. R.W. lived in a trailer with her boyfriend, the victim, about half a mile away. An elderly woman we shall refer to as M. also lived in a trailer nearby. M. suffered from dementia and was nearly blind. R.W. and the victim were helping her with running various errands. There was also evidence, presented by the defense, they were stealing money from M.'s bank account while doing so. According to defendant's testimony, he first met R.W. and the victim at a party, where he overheard the former bragging about stealing from M. Defendant became disgusted and left the party. Later, after speaking to M. alone and accompanying her to the bank, where he obtained various account documents, defendant reported his suspicions to his probation officer. The probation officer confirmed this conversation with defendant took place.

### The Stabbing and Threats

About one week later, defendant's girlfriend borrowed one of M.'s cars. She never returned it. According to defendant's testimony, his girlfriend also knew M. and borrowed the car on defendant's behalf because his Jeep had been in a collision and he needed transportation while it was being repaired. At some point, defendant and his girlfriend drove the car to Thunder Valley Casino, where the ignition key became detached from its plastic bow and was lost. Unable to start the car, they left it in the parking lot, retaining the keyless entry remote control (key fob). Sometime later, according to the victim's testimony, M. asked him to find and retrieve the car for her, which he did. While no one reported the car stolen, defendant believed R.W. and the victim had retrieved it in retaliation for him "screwing with their meal ticket." About one week after the car was borrowed, defendant spoke to his probation officer about the situation. The officer gave him some obvious advice: have the person who borrowed the

3

car—defendant did not tell the officer it was his girlfriend who did so—return the key fob.

Rather than follow his probation officer's advice, defendant went to R.W.'s trailer at around 2:00 a.m. the following day and confronted the victim. The victim was standing on a chair outside the trailer, either knocking on a window or trying to open it with a screwdriver or putty knife.[4] Defendant approached from behind, reached up and grabbed the victim by the mouth with his right hand, and pulled him off of the chair. When the victim fell to a kneeling position on the ground, defendant held a knife to his throat. As the victim described in his testimony, defendant made small side-to-side movements with the knife, cutting his neck "a little bit at a time," while saying: "I'm going to kill you. I'm going to kill you." Defendant also demanded to know "why [the victim] reported his girlfriend to the police." Afraid for his life, the victim said he had money M. gave him to replace the keys to her car. This caused defendant to lower the knife from his throat. When defendant did so, the victim pushed back into defendant with his body to create some separation and then ran towards a car that was parked nearby. Defendant gave chase, repeated that he was going to kill the victim, and stabbed him in the shoulder before he could reach the car. The victim yelled out for help, causing one of his neighbors to come outside to see what was going on. At this point, defendant ended the confrontation with the victim, pointed the knife at the neighbor, and said, "it's personal" as he walked away.

The neighbor called 911. Police and emergency medical personnel arrived within minutes. The victim was transported to the hospital, where he was treated for his injuries. Surgery was performed to explore and repair the wounds. Later in the morning, in

---

**4** R.W. was not home to let the victim inside the trailer.

response to statements made by the victim at the hospital identifying defendant only by his first name, police responded to the motel where defendant was living. When an unidentified individual walked past, one of the officers yelled: "Hey, Adam." That person did not turn around. Defendant, however, opened the door to his room and said: "Did somebody call out Adam?" Defendant was taken into custody. He became agitated when asked to lift up his shirt to be photographed, but complied, and was otherwise calm and cooperative. Aside from a superficial scratch on his back, defendant had no recent injuries. In an alley behind defendant's motel, police found several items of wet clothing beneath the bathroom window of defendant's room. The room was also searched, but nothing of evidentiary value was recovered.

### *Defense Case*

As mentioned, in addition to the counts of conviction, defendant was charged with attempted murder. The defense case sought to establish defendant acted in self-defense when he stabbed the victim, had no intent to kill, and he suffered from PTSD from his prior military service in the Iraq War, a condition that became worse after an incident in 2012 in which defendant was shot while evading a sheriff's deputy.

Defendant's parents testified concerning their observations of changes in defendant's behavior following the war, such as being "nervous," "quicker to react to situations," and "vigilant about who and what was around him." After the shooting incident, defendant became "paranoid" and "fearful for his life." As his mother described: "He had panic attacks, nightmares, couldn't sleep. He became very depressed and easily upset, as compared to before." He was living with his parents at the time and would periodically climb onto the roof because he believed police or others were looking for him. On one occasion, defendant stayed out all night. When his mother called to find out where he was, defendant asked her whether the police were there and would not

5

accept her assurance they were not. He came home several hours later "half naked from the waist up, covered in mud and debris," and "shivering." He said he had been hiding in an irrigation ditch because he "saw the police" and "was sure they were after [him]." Defendant also tried to commit suicide on three occasions.

Dr. Linda Barnard testified as an expert in PTSD. We need not set forth her testimony in detail. For present purposes, we note that based on her review of various police reports and interviews with defendant and his parents, the doctor formed the opinion defendant suffered from PTSD stemming from his experiences in the war and the shooting incident noted above.

Defendant also testified in his own defense. He described his military service, a drug addiction he developed following his discharge, the details of the 2012 shooting incident, and his suicide attempts. He then described meeting the victim and R.W., his discovery of their financial abuse of M.,[5] and the circumstances surrounding the borrowing of M.'s car and failure to return it. According to defendant's testimony, he was trying to return the key fob to M. when the confrontation with the victim occurred. He went to M.'s trailer twice during the daytime to do so, but she was not home. Later, during the early morning hours of the next day, he was walking down the main street between his motel and M.'s trailer when he saw her car turn down a nearby street heading towards the victim's trailer. Assuming M. was with the victim, defendant walked over there.

Defendant testified he was somewhat apprehensive about interacting with the victim because he heard the victim discovered he was helping M. and threatened to "handle" him. According to defendant's testimony, when he arrived at the trailer, the

---

[5]    As mentioned, the defense presented evidence R.W. and the victim were in fact stealing from M.

6

victim was standing on a small ladder with a screwdriver or putty knife in his hand. When defendant asked where M. was, the victim stepped down from the ladder and "made a gesture . . . like he's somebody [to be] reckoned with." Defendant reacted to what he perceived to be a threat, grabbed the hand that was holding the screwdriver/putty knife, and then put his other hand in the victim's mouth, a maneuver he referred to as a "fishhook." Turning the victim around by the mouth, defendant pulled out a pocket knife and held it to his throat, ordering him to "[t]ake a knee." The victim dropped the screwdriver/putty knife and complied. Defendant then released the victim and started to walk away from the confrontation, at which point the victim reached for the instrument he had just dropped and defendant stabbed him in the shoulder to prevent him from doing so. Defendant ran back to his motel room, where he "started freaking out," removed his shoes and clothes, rinsed them off in the sink "to get rid of any blood or anything that was on there," threw them out the window, and then showered and shaved.

According to defendant's testimony, he did not intend to kill the victim. As defendant explained, he "could have cut [the victim's] whole head off if [he] wanted to," but "because [the victim] was cooperating and [defendant] wasn't there to hurt him," the altercation would have ended had the victim not tried to pick up the screwdriver/putty knife, adding, "he shouldn't have done that." Defendant also denied making any threats against the victim's life.

DISCUSSION

I

*Evidentiary Claim*

Defendant claims the trial court abused its discretion and violated his federal constitutional rights by allowing the prosecutor to cross-examine Dr. Barnard about her review of several police reports. Specifically, he argues the prosecutor related "irrelevant

7

and prejudicial hearsay" to the jury through her questioning of the expert in violation of his due process rights. After the parties submitted their appellate briefing, our Supreme Court decided *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), holding: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay"; and if that hearsay is testimonial, "there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id*. at p. 686.) We directed the parties to address this new authority in supplemental briefing. Having reviewed the supplemental submissions, we conclude the trial court abused its discretion and violated defendant's confrontation rights by allowing the challenged questioning, but further conclude beyond a reasonable doubt the error was harmless.

## A.

### *Additional Background*

During the prosecutor's cross-examination of Dr. Barnard, the doctor was asked to state what she reviewed in making her assessment defendant suffered from PTSD. Among other things, the doctor stated she reviewed a number of police and sheriff's reports from multiple jurisdictions generated between 2001 and 2013. Over objections, the prosecutor was allowed to describe the contents of five of these reports and ask whether the doctor had taken the purported facts contained therein into consideration in forming her conclusions.

Specifically, the prosecutor asked whether the doctor considered a 2001 police report "where [defendant] kicked out a window at a gas station, crawled inside and choked the attendant, hit him over the head with a board, slammed him over the counter, and punched him." After the doctor answered that she considered the contents of that

8

report, the prosecutor asked whether she also considered a 2003 sheriff's report indicating defendant "knocked someone unconscious" and "broke another person's jaw" during a fight in a bar because "he was upset that the [bartender] wouldn't serve him," stating to the bartender, "Don't you know where I've been?" The doctor acknowledged she read that report and also acknowledged that "on [the] surface" such an incident was "consistent with anger or pride as [o]pposed to a PTSD episode."

The prosecutor then asked whether Dr. Barnard reviewed a 2006 sheriff's report regarding a domestic violence incident in which defendant "threatened his wife with a gun, threw [her to] the ground, pointed the gun at her, and then had a 15-minute standoff with officers." The doctor acknowledged she reviewed and considered the facts contained in this report. In response to further questioning, she stated they "could be" consistent with a PTSD episode, but also acknowledged defendant was able to control his actions to the extent he did not "beat his wife" or "kill any officers." The prosecutor further asked the doctor whether she reviewed a 2012 police report stating, "defendant was screaming at a bar, punched a manager in the face, and then ran from officers" while yelling, "Fucking taser me, you fucking pigs" and "Fuck you. I'm a marine. Come get me, mother fuckers." The doctor acknowledged reviewing the report and agreed the facts indicated defendant was aware of his surroundings and "[p]robably not" in a PTSD-induced flashback.

Finally, the prosecutor asked the doctor concerning her review of the police report generated following the 2012 shooting incident she concluded contributed to defendant's PTSD, specifically whether she considered "what had happened before he was shot," i.e., "he had brandished a gun at patrons at a bar," "sped 80 miles an hour away from officers into oncoming traffic trying to get away," and "after he stopped, he reversed his vehicle

9

and tried to run over an officer." The doctor acknowledged reviewing that report and using it in evaluating whether defendant suffered from PTSD.[6]

The trial court allowed these questions to be asked in this fashion "because these are reports that [the doctor] reviewed to come to her diagnosis and she could be tested to find out how any of those things affected her diagnosis." In addition to contemporaneous objections, defense counsel moved for a mistrial following the prosecutor's cross-examination, which was denied.

Thereafter, the jury was instructed with CALCRIM No. 360 as follows: "Dr. Barnard testified that in reaching her conclusions as an expert witness, she considered statements made by the defendant and his parents and statements contained in documents. You may consider those statements only to evaluate the expert's opinion. Do not consider those statements as proof that the information contained in the statements is true."

## B.

### *Analysis*

"Until very recently, the law governing expert witnesses' reliance on hearsay—and the latitude given them to testify about such hearsay—seemed fairly well settled. For instance, in [*People v. Gardeley* (1996) 14 Cal.4th 605 (*Gardeley*)], our Supreme Court

---

**6**    The Attorney General addresses an additional "road rage incident" that was described in defendant's medical records. However, the prosecutor's questioning of Dr. Barnard regarding this incident was not challenged in defendant's opening brief and any contention the trial court erred in allowing such questioning is therefore forfeited. (See *People v. Roscoe* (2008) 169 Cal.App.4th 829, 840 [issues not raised in the opening brief are forfeited].) In any event, we would agree with the Attorney General that the statements in the medical records, while case-specific hearsay, were nevertheless admissible under exceptions to the hearsay rule (Evid. Code, §§ 1220, 1271) and were not testimonial in nature.

held a gang expert could testify to out-of-court statements he [or she] had heard from fellow officers and gang members, including a co-participant in the crimes with which the defendants were charged, relating to the gang's activities [citation], and upon that basis could opine that the crime with which defendants were charged was a ' "classic" example of gang-related activity' [citation]. The court relied upon the following rule: 'because Evidence Code section 802 allows an expert witness to "state on direct examination the reasons for his [or her] opinion and the matter . . . upon which it is based," an expert witness whose opinion is based on such inadmissible matter can, when testifying, describe the material that forms the basis of the opinion.' [Citation.] In such a case, so the theory goes, the gang members' statements are not admitted for their truth, but only as basis evidence for the expert's opinion. [Citation.] This was not a new development in *Gardeley*; California had long followed this not-admitted-for-its-truth rule. [Citations.]" (*People v. Stamps* (2016) 3 Cal.App.5th 988, 993.)

This changed in *Sanchez*, *supra*, 63 Cal.4th 665. There, our Supreme Court rejected the not-admitted-for-its-truth rationale with respect to "case-specific hearsay," i.e., hearsay "relating to the particular events and participants alleged to have been involved in the case being tried" (*id*. at p. 676), explaining, "this paradigm is no longer tenable because an expert's testimony regarding the basis for an opinion *must* be considered for its truth by the jury." (*Id*. at p. 679.) However, the expert may still testify "concerning his [or her] general knowledge, even if technically hearsay," because experts frequently acquire their knowledge from hearsay and this "[k]nowledge in a specialized area is what differentiates the expert from a lay witness, and makes his [or her] testimony uniquely valuable to the jury in explaining matters 'beyond the common experience of an ordinary juror.' [Citations.]" (*Id*. at p. 676.) Thus, as at common law, the court drew a "distinction between generally accepted

11

background information and the supplying of case-specific facts," providing the following as an example of the difference: "That an associate of the defendant had a diamond tattooed on his arm would be a case-specific fact that could be established by a witness who saw the tattoo, or by an authenticated photograph. That the diamond is a symbol adopted by a given street gang would be background information about which a gang expert could testify." (*Id*. at p. 677.) The court specifically held: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id*. at p. 686, fn. omitted.)

Here, we do not have a situation in which a prosecution expert witness related case-specific hearsay to the jury and treated those hearsay statements as true to support her opinion. Instead, *the prosecutor* related the case-specific hearsay, *through cross-examination of the defense expert*, and asked whether she considered that information in forming her conclusion defendant suffered from PTSD. In other words, the case-specific hearsay was being used to impeach the expert's testimony. Generally, "a witness testifying as an expert . . . may be fully cross-examined as to . . . the matter upon which his or her opinion is based and the reasons for his or her opinion." (Evid. Code, § 721, subd. (a).) "The scope of cross-examination of an expert witness is especially broad. [Citation.] Evidence that is inadmissible on direct examination may be used to test an expert's credibility, though the court must exercise its discretion under Evidence Code

12

section 352 to limit the evidence to its proper uses." (*People v. Gonzales* (2011) 51 Cal.4th 894, 923.)

However, we have found no authority standing for the proposition that the breadth of permissible cross-examination extends to the admission of case-specific testimonial hearsay in violation of a defendant's right of confrontation. While this case arguably represents the flipside of *Sanchez, supra,* 63 Cal.4th 665, as in that case, Dr. Barnard was asked to treat the challenged statements in the police and sheriff's reports as true. Indeed, if they were not true, the statements would have no impeaching value. The statements were then used, not to support, but to undermine her opinion. We conclude the reasoning of *Sanchez* applies equally in these circumstances. The Attorney General does not argue otherwise. Nor does the Attorney General dispute the challenged statements are both case-specific and testimonial. The statements are case-specific, as that term is defined in *Sanchez*, because they relate to whether defendant suffered from PTSD at the time he threatened and stabbed the victim. They are testimonial because, as in *Sanchez*, the reports "were compiled during police investigation of these completed crimes" and Dr. Barnard treated as true "these case-specific facts from a narrative authored by an investigating officer." (*Sanchez*, *supra*, 63 Cal.4th at p. 694.) And because there was no showing of unavailability or that defendant had a prior opportunity for cross-examination or forfeited that right by wrongdoing, we must conclude admission of the testimonial hearsay violated defendant's right of confrontation. (*Id*. at p. 686.)

We now turn to the question of prejudice and conclude the violation was harmless beyond a reasonable doubt. (See *People v. Capistrano* (2014) 59 Cal.4th 830, 874 [confrontation violation judged by harmless beyond reasonable doubt standard of prejudice].) We first note defendant was acquitted of both attempted murder and the lesser included offense of attempted voluntary manslaughter. He was convicted of

13

assault with a deadly weapon and making a criminal threat. An assault conviction requires proof the defendant did (1) "an intentional act" with (2) "actual knowledge of those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another." (*People v. Williams* (2001) 26 Cal.4th 779, 790.) There was no dispute that if an assault occurred, it was done with a deadly weapon, i.e., a knife. Nor was there any dispute defendant intentionally stabbed the victim with that knife. His defense was that he did so in self-defense. Thus, Dr. Barnard's testimony was not directly relevant to defendant's culpability for this crime. As the jury was properly instructed, her testimony that defendant suffered from PTSD could be considered "only for the limited purpose of deciding whether, at the time of the charged crime, the defendant acted with the intent or mental state required for that crime." Here, where both the act and requisite mental state were essentially conceded, the only question for the jury to resolve was whether a reasonable person in defendant's position would have believed he needed to hold a knife to the victim's neck and then stab him in the shoulder in order to defend himself from the victim. Because self-defense is judged by an objective standard, resolution of this question turned not on whether defendant suffered from PTSD, but whether the jury believed the victim's account of events or that provided by defendant. Nowhere in the instructions was the jury informed a PTSD diagnosis was relevant to the question of credibility one way or the other.

Turning to the criminal threat conviction, the elements of this crime are: "(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by

14

means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227-228.)  While this crime does require a specific intent the threat is to be taken as such, defendant's defense to this crime was not that he lacked the intent to threaten, but that he did not utter the threat at all.  Again, resolution of this question did not turn on Dr. Barnard's PTSD diagnosis, but on whether the jury believed the victim or defendant.

Nevertheless, defendant argues the jury likely believed it could use the testimonial hearsay not only to assess Dr. Barnard's PTSD diagnosis, but also to judge defendant's credibility and to conclude he was "a bad or violent person" and therefore more likely to have committed the charged crimes.  Regarding the use of prior crimes evidence, the jury was specifically instructed: "Do not consider this evidence for any other purpose except for the limited purpose of determining the defendant's credibility. [¶] Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime."  Because "[w]e presume the jury followed these instructions, and defendant has not rebutted this presumption" (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1326), we must reject his argument the jury improperly used the challenged evidence as character evidence.  But the same presumption compels the conclusion the jury did use the evidence to assess defendant's credibility.  However, as the Attorney General points out, four of the five prior incidents with law enforcement properly came into evidence by other means.  Indeed, defendant was cross-examined concerning each incident with the

15

exception of the 2001 incident. He did not deny any of the events occurred. Nor does he assert this impeachment was improper. (See Evid. Code, § 1101, subd. (c); see also *People v. Kennedy* (2005) 36 Cal.4th 595, 620, disapproved on another ground in *People v. Williams* (2010) 49 Cal.4th 405, 459.) Thus, the details of four of the five incidents properly made their way before the jury for purposes of impeaching defendant's testimony. We conclude that hearing about these four incidents an additional time, and in a much more condensed manner, during Dr. Barnard's testimony would not have made any difference in the jury's assessment of defendant's credibility.

We are left with the 2001 incident, "where [defendant] kicked out a window at a gas station, crawled inside and choked the attendant, hit him over the head with a board, slammed him over the counter, and punched him." In light of the other incidents, we cannot conclude this incident would have swayed the jury to disbelieve defendant. While undeniably violent, it was not any more violent than the other four. And, as already explained, the jury was specifically instructed it could not use this or any of the incidents to conclude defendant was disposed to commit crime. We also note the jury apparently credited defendant's testimony, at least to the extent of finding there to be a reasonable doubt as to whether he intended to kill the victim. What the jury did not believe was defendant's testimony he did not utter a criminal threat. Nor did the jury believe a reasonable person in defendant's position would have concluded he needed to assault the victim with a knife in order to defend himself. Based on all of the evidence, we conclude beyond a reasonable doubt this over-a-decade-old incident in which defendant assaulted a service station attendant would not have made a difference in the jury's resolution of these issues.

16

# II

## *Section 654*

Defendant also contends the trial court violated section 654 by imposing and executing sentence on both the assault with a deadly weapon and the criminal threats convictions because these offenses were committed with the same intent and objective. We disagree.

"An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)  "The purpose of this statute is to prevent multiple punishment for a single act or omission, even though that act or omission violates more than one statute and thus constitutes more than one crime.  Although these distinct crimes may be charged in separate counts and may result in multiple verdicts of guilt, the trial court may impose sentence for only one of the separate offenses arising from the single act or omission—the offence carrying the highest punishment." (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312; *People v. Mendoza* (1997) 59 Cal.App.4th 1333, 1345.)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective." (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Where "different crimes were completed by a 'single physical act.'  [T]he defendant may not be punished more than once for that act." (*Ibid*.)  For example, "the forceful taking of a vehicle on a particular occasion is a single physical act under section 654" despite the fact this act amounts to both a robbery and a carjacking.  (*Id*. at pp. 313-314.)  Here,

17

defendant threatened the victim's life while holding a knife to his throat, cutting his neck in the process, and then stabbed him in the shoulder with the knife as he tried to run away. Thus, while the crimes arguably occurred simultaneously, it was the physical act of attacking the victim with the knife that completed the actus reus of assault with a deadly weapon and the separate physical act of threatening to kill the victim in these circumstances that completed the actus reus of making a criminal threat. We must therefore turn to the second step of the analysis.

"Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19; *People v. Rodriguez* (2009) 47 Cal.4th 501, 507.) "In such a case, the defendant's single intent and objective are treated as a single act. For example, a defendant who enters a building with the intent to commit theft and then takes something of value cannot be sentenced for both burglary and theft. Although defendant committed two criminal acts (entering the building and taking the property), the two acts 'were parts of a continuous course of conduct and were motivated by one objective, theft; the burglary, although complete before the theft was committed, was incident to and a means of perpetrating the theft.' [Citation.]" (*In re Jose P.* (2003) 106 Cal.App.4th 458, 469, disapproved on another point in *People v. Prunty* (2015) 62 Cal.4th 59, 78, fn. 5; see also *People v. Latimer* (1993) 5 Cal.4th 1203, 1216 [defendant convicted of kidnapping and rape; separate punishment for kidnapping not permitted because the sole objective of the kidnapping was to facilitate the rape].)

However, if the "defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he [or she] may be

punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.' [Citation.]" (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) Whether a defendant harbored multiple independent criminal objectives is a question of fact for the trial court, whose findings will not be reversed on appeal if there is any substantial evidence to support them. (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

Defendant argues the fact he threatened to kill the victim while assaulting him with the knife makes it "clear that both of these offenses were committed with the same intent and objective." He does not state what that common intent and objective was. However, because the crime of making a criminal threat requires a "specific intent that the statement . . . is to be taken as a threat" (§ 422), we construe defendant's argument to be that his common intent and objective in threatening the victim and assaulting him with the knife was to place him in immediate fear for his life. In response, the Attorney General argues substantial evidence supports a conclusion defendant harbored "independent criminal objectives when he committed the crimes of assault with a deadly weapon and criminal threats," i.e., "to inflict physical injury and mental terror on [the victim]." We agree with the Attorney General. Even assuming the act of holding the knife to the victim's throat was committed with the same intent as the making of the threat, and was done to impress upon the victim the seriousness of the threat, when the victim broke free from defendant's control and started to run away, defendant gave chase and stabbed him in the shoulder. The trial court could have properly found this was done with the separate and independent intent to inflict great bodily injury.

The trial court did not violate section 654 by imposing and executing sentence on both the assault with a deadly weapon and the criminal threats convictions.

## DISPOSITION

The judgment is affirmed.

_____/s/_____
HOCH, J.

We concur:


_____/s/_____
BLEASE, Acting P. J.


_____/s/_____
HULL, J.