Filed 9/29/23  P. v. Dekalb CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAMES DEKALB,<br><br>    Defendant and Appellant. | A162755<br><br>(Contra Costa County Super. Ct. No. 05-190796-3) |

Defendant James Dekalb seeks reversal of a judgment of conviction issued upon a jury verdict finding him guilty of first degree burglary and two misdemeanors.  He was sentenced to 12 years in state prison for the burglary offense.

At trial, Dekalb presented an expert psychologist who testified that Dekalb had a mental disorder and that the disorder impaired his thinking and planning ability.  On the strength of this testimony, Dekalb argued he lacked specific intent to commit burglary.

Dekalb claims error for multiple reasons, but principally because the trial court allowed the prosecutor to impeach his expert psychologist with inadmissible testimonial hearsay from medical records prepared the day before the subject incident.  Dekalb also argues that the prosecutor engaged in prejudicial prosecutorial misconduct.

1

We reject these arguments. Assuming arguendo that there was court error or prosecutorial misconduct, we conclude any such error or misconduct was harmless on this record. Accordingly, we affirm.

## I. BACKGROUND

### A. *The Charges Against Dekalb*

In May 2019, the Contra Costa District Attorney filed an information charging Dekalb with first degree burglary (Pen. Code, § 459),[1] illegal possession of tear gas with a prior conviction (§ 22810, subd. (a)), and illegal possession of a stun gun (§ 22610, subd. (a)), all arising out of an incident that occurred on February 25, 2019. The district attorney further alleged that Dekalb had been convicted of several different serious or violent felonies (§§ 667, subds. (a)(1), (d) & (e), 667.5, subd. (b), 1170.12, subds. (b) & (c), & 1203, subd. (e)(4)).

### B. *Pre-Trial Proceedings*

After his counsel expressed a doubt about his competency to stand trial, Dekalb was examined by a court-appointed psychologist, Dr. Marlin Griffith. In July 2019, the court, based on a report by Dr. Griffith, found that Dekalb was unable to understand the nature and purpose of the proceedings or work with his counsel in presenting a defense and committed him to the Department of State Hospitals for restoration of his competency. Sixteen months later, in November 2020, the court, based on a report by Dr. Griffith, found Dekalb competent to stand trial and reinstated criminal proceedings.

Prior to trial, the prosecutor moved in limine to exclude as not relevant police officer testimony that, beginning two days before the subject incident, on February 23, 2019, Dekalb was placed on a psychiatric hold under Welfare and Institutions Code section 5150. Dekalb's counsel contended the evidence,

---

[1] Undesignated references are to the Penal Code.

2

including a report that the officer found Dekalb wandering into traffic and talking nonsensically, was relevant because it showed Dekalb, just a few days before the incident, exhibited the kind of "non-linear, non-planned, disorganized thinking" that was at the heart of the defense. The court granted the prosecutor's motion.

Dekalb's defense sought to raise a reasonable doubt that he intended to steal things when he entered the victim's home, a necessary element of first degree burglary,[2] contending his mental condition impeded his ability to form that intent. His defense counsel retained Dr. Griffith to conduct another psychiatric examination of Dekalb about a month before trial and sought to introduce Dr. Griffith as an expert witness. The prosecution moved to exclude testimony by him regarding Dekalb's mental state at the time of the incident or, in the alternative, for the court to hold a hearing under Evidence Code section 402 to consider the issue.

The trial court held the section 402 hearing. It barred Dr. Griffith from testifying about Dekalb's competency to stand trial; limited his testimony to mental diseases, defects, or disorders that affect a person's ability to form specific intent; and issued a ruling regarding Dekalb's psychiatric hold that is at the heart of this appeal.

The background and specifics of that ruling are as follows. Prior to the section 402 hearing, the defense sought to have Dr. Griffith testify regarding medical records created during the psychiatric hold, on February 23 and 24, 2019 (5150 records), that the defense had subpoenaed. The prosecution and

---

[2] See section 459 ("Every person who enters any house . . . with intent to commit grand or petit larceny or any felony is guilty of burglary"); section 460, subdivision (a) ("Every burglary of an inhabited dwelling house . . . is burglary of the first degree").

the court thought such testimony would raise "a *Sanchez* hearsay problem,"[3] but the court allowed defense counsel to question Dr. Griffith on the subject at the section 402 hearing. Defense counsel neglected to ask Dr. Griffith about the records, but proffered that Dr. Griffith would testify they were relevant to the question of Dekalb's mental state at the time of the February 25, 2019 incident. The court ruled that Dr. Griffith could not volunteer any testimony about the records because it would constitute hearsay under *Sanchez*. It directed Dr. Griffith to make "no mention about that 5150 . . . , so I don't want you to volunteer any testimony on it, . . . so just don't mention it." It also denied defense counsel's request to present more limited testimony about the records, stating the defense had "enough with Dr. Griffith based on his own personal evaluation of Mr. DeKalb that he exhibited all the symptoms of being bipolar," the records did not add anything to Dr. Griffith's testimony, and the defense would be able to ask a hypothetical drawing from the facts of the case.

Dekalb's counsel then noted the prosecutor, in her cross-examination of Dr. Griffith at the hearing, had referred to a note in the 5150 records indicating that Dekalb "had a coherent and goal-oriented thought process at one point" and asked the court to exclude this reference as also involving inadmissible hearsay. The court denied this request, telling Dekalb's counsel there was a difference in how the two sides were using the records because the prosecutor was "not using [the 5150 records] for the truth of the matter. It could be completely false that he was goal directed. The difference . . . is that . . . [Dr. Griffth] says he relied upon those records and it's not consistent with his diagnosis and impression and opinions. [¶] So it almost doesn't matter what it was except that it's different from what the doctor says his

---

[3] See *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

opinion is. So there's a big difference between letting it come in for the truth of the matter, which is what you want to do, which is not proper because it's hearsay, and [the prosecutor's] use of it as impeachment." At Dekalb's counsel's request, the court said it would instruct the jury that the prosecutor's use of the 5150 records was "solely for impeachment and . . . not for the truth of the matter," but did not so instruct to the jury.

## C. *The Prosecution's Case*

### 1. Eyewitness Testimony

At trial, the prosecution presented three eyewitnesses of the subject incident and its immediate aftermath. First, Andrea Z., testifying through an interpreter, said that she returned to her Antioch, California home at about 1:00 p.m. on February 25, 2019, after doing an errand to find a strange man in her home. Her testimony on direct was somewhat confused. At first, she indicated she was by her car when she saw the man and began running after him, but then said she first saw the man inside her house. The man carried a briefcase that was not hers, some candles, some boxes, and two of her jewelry chains, which she took back from him. When she took the chains, he threw the boxes down and pepper-sprayed her.

After a lunch recess, Andrea Z. testified that she was nervous and the details of the incident, two years old at the time of trial, were fuzzy. Asked further about the incident, she said she was inside her house when she saw the strange man in her bedroom. She saw him take her chains (which she also called bracelets), which she had left out on a bedroom vanity. She chased him and her jewelry fell to the ground. She picked them up and continued to chase the man to see what else he had. He then pepper-sprayed her, which prevented her from seeing anything else.

5

Andrea Z. further testified that at the time of the incident, she always left her house doors unlocked.  The front fence around the house was closed but a back fence was open.

On cross-examination, Andrea Z. said she had had two strokes since the incident, which she said on redirect "blocked" her memory.  On cross, she again said she saw the strange man when getting out of her car, and also said that she "saw something weird" and went into her house.

Asked on cross if she recalled speaking twice to a defense investigator, she said she recalled speaking by phone once in March 2021 to a woman, with her daughter's translation help.  She denied telling the investigator that she saw the man coming out of her house when she got out of her car, saying she told her she saw him coming out her room, and she denied telling the investigator that she took things out of the man's hands when she chased him.  Rather, she said, when she chased him, "he had a lot of stuff in his hands" and let go of her chains.  She also said he pepper-sprayed her from about a meter away, and denied telling a female police officer in February 2019 that he sprayed her from about 30 feet away.  She acknowledged that she did not see the man had any crowbars or pry bars or the like, nor see any damage to her door or windows.

The second eyewitness was H.S., who lived across the street from Andrea Z.  At about 1 p.m. on February 25, 2019, he saw Dekalb walking away from his family's car and papers from the car everywhere, as if the car had been rummaged through.  From a distance, he followed Dekalb, who was "pacing down the street frantically," and called 911.  Dekalb started yelling things at him.  Andrea Z. also followed Dekalb and said he had broken into her home and stolen things.  Dekalb pepper-sprayed Andrea Z. from a distance of five to ten feet away and she stopped pursuing him, but H.S.

6

continued on. Dekalb threw the spray can down and speed walked away, though he stopped to tie his shoes many times. He also briefly spoke to a neighbor sitting on a stoop. About 15 to 20 minutes after H.S. began following him, police arrived and detained Dekalb. H.S. showed police the location of the pepper spray can.

The third eyewitness was an Antioch police detective, who testified that H.S. flagged him down and directed him to Dekalb, who matched the dispatcher description of a fleeing suspect wearing a dark-colored hoodie and bandana over his face; that Dekalb did not resist police, and was found to have a working stun gun in his sweatshirt pocket and nothing else of significance, such as stolen items; that he detained Dekalb and placed him in his patrol car in less than five minutes, told him his *Miranda*[4] rights, which Dekalb said he understood, and five minutes later drove Dekalb for about five or 10 minutes to a police station.

The detective further testified that Dekalb continually cursed at the detective and rambled about unrelated matters without the detective talking to him. In the middle of doing so, Dekalb spontaneously made comments about the burglary, saying, " 'That jewelry wasn't even that nice,' " " 'The bitch was coming at me so, yeah, I sprayed her,' " and, " 'That place wasn't even locked, and all that shit was just lying there.' " The detective wrote these statements down as soon as he arrived at the police station and included them later in his report.

### 2. Testimony About a Prior Incident

Dekalb's grandmother testified that Dekalb stole items from her house on a weekend in 2015 when she was out of town. She returned to her house after her neighbor called and said her truck was gone to find her truck and

---

[4] See *Miranda v. Arizona* (1966) 384 U.S. 436.

numerous items from her home missing, including all of her and her husband's jewelry, a laptop, a pistol, and three long guns. A security door in the garage was torn open and the house keys hanging inside the garage door were gone. Police recovered a missing gun and jewelry from Dekalb's backpack. When the grandmother called Dekalb about the gun, he said he did not know what she was talking about and that he had been at Bible study.

During cross-examination, the trial court, upon the prosecutor's relevance objection, prohibited the grandmother from testifying about whether Dekalb began acting strangely when he was 18 or 19 years old and denied the defense request for a side bar on the subject.

## D. *The Defense Case*

At trial, Dr. Griffith, who said he was a clinical forensic psychologist, was allowed to testify as a defense expert in the field of clinical and forensic psychology and the diagnosis of bipolar disorder. On direct, he testified that, as a court-appointed psychologist, he examined Dekalb in June 2019. He concluded at the time that Dekalb's "diagnosis was unclear" but thought his behavior, demeanor, and comments "were consistent with . . . schizoaffective disorder bipolar type."

According to Dr. Griffith, the "schizo" part of schizoaffective disorder involves "hallucinations, delusions, [and] thought disorder" and the "affective" part involves "unstable moods, be it manic or depressive mood states." "Bipolar type" identifies "the mood aspect of the disorder as more prominent." A manic state involves an "elevated and expansive mood or increased level of energy," a person being "hyper verbal," and "excessive activities" with the person having "several balls in the air . . . without completing anything." With bipolar disorder, "the thought process is . . . not focused, jumping from one subject to another. It's disorganized in that sense.

8

The person is distractible, not able to . . . really think things through or plan things in a normal fashion." "The thought process is not focused in the sense that the person is thinking through . . . what the situation is or what they are about to engage in. Their thought process is sort of jumping back and forth." A person might exhibit impulsive behavior.

Dr. Griffith further testified that he met with Dekalb in June 2019 for about 40 minutes. Dekalb "was extremely agitated, he lacked focus, he was rambling nonstop. I was not able to get him to respond to the questions that I was asking him. He was on his own course." Dr. Griffith "did not observe any psychotic symptoms," such as hallucinations, and thought it was "questionable" whether Dekalb was having any delusions, but he "just wasn't on subject long enough to kind of understand what was going on."

Dekalb's counsel then posed a hypothetical to Dr. Griffith that was tailored to the defense view of the facts. The hypothetical included that a man walks into a stranger's house in the middle of the day without any burglary tools and walks back out with a few bracelets and candles, which he returns or discards upon being confronted by the homeowner. He then speed walks down the sidewalk without running into other properties, stopping to talk briefly to a person sitting on his stoop, does not run from police, and upon being detained continues to make obscene and off-topic comments, mostly speaking to himself. Four months later, he's observed being "extremely agitated, non-focused, rambling nonstop, unresponsive to simple questions." Dekalb's counsel asked Dr. Griffith if the man displayed symptoms consistent with schizoaffective disorder bipolar type.

Dr. Griffith said his "diagnostic impression" was that "many of the behaviors . . . would be consistent" with that disorder based on "some rambling, disorganized thought process, [and] disorganized behavior"; he

9

clarified upon further questioning, "I guess not necessarily disorganized behavior, but certainly not goal-directed behavior."

On cross-examination, Dr. Griffith was asked about his March 2021 report, in which he concluded that Dekalb was suffering from schizoaffective disorder, bipolar 1, which was the manic type. He testified that he based his conclusion on "[a] review of medical records that I had access to at that time, to add to my observations of, and conclusions." Asked about whether planning could be present for those with bipolar disorder who experience disorganized planning, Dr. Griffith said that planning was not a single activity, and that "[i]t certainly can vary from one end of mild planning to extremely excessive planning. So I guess the answer would be yes, there could be some planning even if the person is disorganized. It's probably more on the disorganized . . . plan end of the spectrum." Also, Dr. Griffith acknowledged that the DSM-5, which was the recognized manual of all the mental illnesses in his field, notes an increase in goal-directed activity in both bipolar 1 and 2 types.

The prosecutor then asked, "Are you aware of medical records from February 24th, 2019, that note Mr. DeKalb's thought process was goal-directed and coherent?" Dr. Griffith said he saw the note. On redirect, he testified that he did not prepare the note, and that it did not change his diagnosis of Dekalb's bipolar disorder because the disorder could be in remission at any particular point and could be exacerbated by stress conditions and trauma.

After Dr. Griffith testified, Dekalb's counsel again asked that the 5150 records subpoenaed by the defense be admitted into evidence, indicating that they came with a declaration by the custodian of records so as to overcome a hearsay objection, an apparent reference to the business records hearsay

exception.[5]  Counsel argued the prosecutor's cross-examination opened the door to the records, contended the prosecutor had misleadingly left out that the 5150 records indicated Dekalb displayed a goal-oriented and coherent thought process at a time when he was given antipsychotic medication, and argued a violation of Dekalb's state and federal due process rights had occurred that should be remedied by the admission of the 5150 records.  The court said it continued to find any evidence of Dekalb's 5150 hold "not relevant to the charges," that the prosecutor's questioning did not "open the door to the 5150 by any stretch of the imagination," and denied the defense request.

Dekalb also presented the testimony of his defense investigator, who said she spoke by phone in Spanish to Andrea Z. in April 2019 and March 2021; and also testified that Andrea Z. said in both phone calls, with minor differences, that on the day of the incident she came home to find a man in her driveway holding two of her chains, that she took the chains out of his hands, that the man pepper-sprayed her from about 25 feet away, and that she was never in the house with the man at the same time.

E. *Verdict, Sentence, and Appeal*

During deliberations, the jury's written questions to the court included, "Do we have to all agree that there was intent in order for a guilty verdict on count one (459)?"  The court responded, "Yes."

The jury found Dekalb guilty of all three counts.  The court found Dekalb had suffered a May 2017 prior conviction for a serious or violent felony, which satisfied certain enhancement or strike allegations, and dismissed the two section 667.5, subdivision (b) allegations.  The court sentenced Dekalb to the aggravated term of six years for first degree

---

[5] See Evidence Code sections 1271, 1560–1567.

11

burglary, which it doubled because of the prior strike allegation to 12 years in state prison. It sentenced him on the remaining two misdemeanor counts to terms of 364 and 60 days in county jail that were already satisfied by Dekalb's custody credits, awarded him additional conduct credits, and imposed various fines and fees.

Dekalb filed a timely notice of appeal.

## II. DISCUSSION

### A. *Any Trial Court Error Regarding the Prosecutor's Impeachment of Dr. Griffith Was Harmless*

Dekalb argues the trial court prejudicially erred by letting the prosecutor impeach Dr. Griffith with a portion of the 5150 records which noted that Dekalb displayed a goal-oriented and coherent thought process the day before the incident.

In support of this claim, Dekalb contends that the prosecutor's impeachment evidence should have been excluded under Evidence Code section 352 and was inadmissible "testimonial" hearsay in violation of his Sixth Amendment right to confrontation under *Crawford v. Washington* (2004) 541 U.S. 36. But his primary contention is that the trial court erred because the impeachment evidence involved case-specific hearsay prohibited from admission under *Sanchez, supra,* 63 Cal.4th 665.

In *Sanchez*, our Supreme Court held in relevant part that case-specific statements related by a prosecution expert concerning the defendant's gang membership constituted inadmissible hearsay under California law. (*Sanchez, supra,* 63 Cal.4th at p. 670.) The court adopted the following rule: "When an expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the

case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id.* at p. 686, fn. omitted.) The court disapproved of its prior decisions holding that the matters upon which an expert relied in forming an opinion are not offered for their truth or that a limiting instruction, coupled with a trial court's evaluation of the potential prejudicial impact of the evidence under Evidence Code section 352, sufficiently addresses hearsay or confrontation concerns. (*Sanchez*, at p. 686, fn. 13.)

Dekalb further contends that the trial court's error here was similar to that found by the appellate court in *People v. Malik* (2017) 16 Cal.App.5th 587 (*Malik*). In *Malik*, the trial court allowed the prosecution, in the course of cross-examining a defense expert in post-traumatic stress disorder, to relate certain case-specific testimonial hearsay statements contained in various police and sheriff reports spanning more than a decade indicating that the defendant had engaged in violence in the past. (*Id.* at pp. 594–596.) The appellate court "found no authority standing for the proposition that the breadth of permissible cross-examination extends to the admission of case-specific testimonial hearsay in violation of a defendant's right of confrontation," characterized the circumstances before it as "arguably represent[ing] the flip side of *Sanchez*," and concluded that "the reasoning of *Sanchez* applies equally in these circumstances." (*Id.* at pp. 597, 598.) It concluded the trial court's admission of the testimonial hearsay via cross-examination violated the defendant's right of confrontation, although it also concluded the error was harmless. (*Id.* at pp. 598–600.)

13

We agree that the circumstances of this case are similar to those discussed in *Malik* insofar as they suggest the court's admission of the prosecutor's impeachment evidence violated *Sanchez*. Nonetheless, we conclude we do not need to decide this issue, nor further discuss the merits of any of Dekalb's other arguments, because, assuming there was error, it was harmless, as we now discuss.[6]

As Dekalb acknowledges, "[w]e evaluate prejudice resulting from the allowance of expert testimony in violation of *Sanchez* under the standard of *People v. Watson* (1956) 46 Cal.2d 818, which requires reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of error.' (*Id.* at p. 836; see *People v. Ochoa* (2017) 7 Cal.App.5th 575, 589.)" (*People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 510.) We evaluate Evidence Code 352 error under the state standard as well. (*People v. Marks* (2003) 31 Cal.4th 197, 226–227.)

It is true that, in one strand of this argument, Dekalb invokes *Crawford v. Washington*, thereby suggesting we should apply the federal standard for prejudice. But "[t]estimonial statements are those made

---

[6] The trial court initially excluded the 5150 records on *Sanchez* hearsay grounds during the section 402 hearing. Later, during trial, when Dekalb's counsel began arguing to the court that the 5150 records were admissible, apparently under the business records exception to the hearsay rule, the court said that, regardless, it would exclude the records as not relevant to the issues of the case, despite the defense contention that Dekalb's mental condition raised a reasonable doubt that he entered Andrea Z.'s house with the intent to steal. On appeal, Dekalb does not challenge the court's view of the relevance of the 5150 records and, in any event, the issue is of no consequence in light of our conclusion that any error was harmless under the circumstances of the incident and the limited significance of Dr. Griffith's trial testimony.

primarily to memorialize facts related to past criminal activity, which could be used like trial testimony. Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial." (*Sanchez*, *supra*, 63 Cal.4th at p. 689.) Dekalb does nothing to establish the testimonial nature of the 5150 records used by the prosecutor and nothing in the trial record indicates they were testimonial in nature. Regardless, our conclusion that any error by the trial court was harmless would be the same under the "harmless beyond a reasonable doubt" federal standard for evaluating prejudice articulated in *Chapman v. California* (1967) 386 U.S. 18, 24.

Dekalb argues the trial court's error was prejudicial because this was a close case, as indicated by the jury's question to the court on the issue of intent, in which relatively minor changes in the record can be important, and because the court's error went directly to the heart of his defense.

We conclude this was *not* a close case regarding Dekalb's intent to burglarize Andrea Z.'s house, notwithstanding the jury's question for the court, and that there was an overwhelming amount of circumstantial evidence indicating that Dekalb entered Andrea Z.'s house with the intent to steal things, none of which Dekalb grapples with in arguing prejudice. This evidence includes Andrea Z.'s testimony that she found Dekalb at around 1:00 p.m. taking jewelry from her bedroom after he entered her house, that he ran out of the house when she discovered him in her bedroom, that he dropped stolen items as she chased him, and that he pepper-sprayed her as she approached him; H.S.'s testimony corroborating that he encountered Dekalb acting suspiciously in the vicinity of his family's car and that he and Andrea Z. followed Dekalb, who pepper-sprayed Andrea Z., discarded the spray can, and speed walked away; and the detective's testimony indicating

that Dekalb, when he was detained, matched the description of a fleeing suspect wearing a hoodie and a bandana, was found to have a working stun gun in his sweatshirt pocket, and volunteered to the detective that the jewelry "wasn't even that nice," that he deliberately sprayed Andrea Z., and that her house "wasn't even locked" and the items he took from the house were "just lying there."

This evidence strongly points to the conclusions that Dekalb, having with him a hoodie, bandana, pepper spray, and a working stun gun in order to prevent his identification and arm himself, found and entered an unlocked house in the middle of the day, when people were more likely to be at work or school, in order to search its interior for items to steal, found and took potentially valuable items—jewelry—in a bedroom and, knowing he was caught in the act of burglary, fled upon being discovered and, aware he was being followed, discarded the items he had stolen before the police could arrive. These conclusions are confirmed by his spontaneously offered statements to a police detective in the minutes after the incident that pointedly highlighted matters directly relevant to his entering an unlocked house to steal things. To add to this evidence, Dekalb's own grandmother testified that he had broken into her home in 2015 and stolen things from her as well, providing further support for the conclusion that Dekalb committed a burglary of Andrea Z.'s house.

Dekalb's theory about his lack of intent is a stretch given the facts of the case: in effect, he contends that, in the thrall of a mental disorder, he just happened to enter a fenced-off, unlocked house in the middle of the day with no particular intent in mind before being discovered taking jewelry from a vanity in the bedroom of the house and seeking to evade those who followed

16

after him as he fled. This theory is fatally undermined by the evidence we have discussed.

Further, Dr. Griffith's testimony, without the prosecutor's challenged impeachment evidence, was far less than definitive regarding whether Dekalb entered Andrea Z.'s house with the intent to steal things. Dr. Griffith acknowledged that, though during his June 2019 examination of Dekalb, Dekalb behaved in a manner consistent with schizoaffective disorder bipolar type, Dr Griffith could not reach a diagnosis for him at that time. Further, Dr. Griffith, while he testified that in his opinion Dekalb suffered from a schizoaffective disorder, bipolar 1, that could result in disorganized thinking and affect his ability to plan, did not testify that the disorder prevented Dekalb from entering Andrea Z.'s home with the intent to steal things. To the contrary, his testimony merely suggests this *might* be the case, while also stating that "disorganized" planning "can vary from one end of mild planning to extreme excessive planning. So . . . yes, there could be some planning even if the person is disorganized." Dr. Griffith also acknowledged that the "DSM" manual, which all psychologists use to diagnose mental illness, states that in a bipolar and manic episode there is an *increase* in goal-directed activity for bipolar 1 (Dr. Griffith's specific diagnosis for Dekalb in March 2021). And he further testified that the disorder can be in remission at any time. In short, Dr. Griffith's testimony amounted to little more than speculation about Dekalb's state of mind when he entered Andrea Z.'s house on February 25, 2019.

In sum, assuming the trial court erred in allowing the prosecutor's challenged impeachment, it was not reasonably probable that Dekalb would have fared better in the absence of such an error and, further, any error was harmless beyond a reasonable doubt.

### B. *Any Prosecutorial Misconduct Also Was Harmless*

Dekalb also argues the prosecutor engaged in prejudicial misconduct in violation of his federal and state rights to due process.

#### 1. Relevant Proceedings Below

The parties' closing arguments focused primarily on whether or not Dekalb entered Andrea Z.'s house with the intent to steal things, some portions of which are relevant to Dekalb's misconduct claim.

Specifically, in his closing argument, Dekalb's counsel argued that the "[p]rosecutor also, in her cross-examination, referred to, well, how come your opinion's not affected by this note from the day before, February 24, 2019? A note that at that time Mr. DeKalb was goal-oriented and coherent. Who produced that note? Dr. Griffith told you it wasn't him. [¶] The prosecution has presented this note as a reason to doubt Dr. Griffith's testimony. She's presented zero evidence about where that note came from, who authored it and under what circumstances." The court interrupted to admonish counsel that he had "crossed the line" because "that was subject to a motion outside the presence of the jury" and a court ruling, and was not the prosecutor's fault. When counsel continued, he added, "And, in any event, Dr. Griffith told you that it did not affect his opinion."

In rebuttal, the prosecutor, in arguing that Dr. Griffith's testimony was unreliable, said, "I also asked [Dr. Griffith], as [Dekalb's counsel] also addressed in his closing, . . . if [he] was aware that there were medical records on February 24, 2019, which . . . noted Mr. Dekalb possessed goal-oriented behavior or thought process. Dr. Griffith conceded and said, 'Yes.' And so just only last month were we provided with this bipolar diagnosis."

Also in rebuttal, the prosecutor said, "Mr. DeKalb might have bipolar. I don't know that that was proven to you based on Dr. Griffith's testimony at all. [Dekalb's counsel] perhaps raised the possibility, but is it reasonable?

18

No." Dekalb's counsel objected that this was improper argument that constituted prosecutorial misconduct and, when the court asked for a further explanation, suggested a side bar so that he could explain his objection. The court indicated it would discuss the matter later on the record and the prosecutor continued with her argument. The prosecutor went on to argue, "Even if we accept that Mr. DeKalb has bipolar, it does not negate the intent. Mental health might make us do things we don't like, but it doesn't mean that we did not intend to do those things."

At the conclusion of closing argument, the trial court gave further instructions to the jury, including, "The People have the burden of proving beyond a reasonable doubt that the defendant acted with the required intent or mental state, specifically the intent to commit a theft when he entered a building. If the People have not met this burden, you must find the defendant not guilty of burglary. [¶] I want it clear to all jurors that at no point in time does the burden shift to the defense, okay? There may have been some—a little bit of slippage there, [the prosecutor], on that aspect, but it's clear, Ladies and Gentlemen, that it is the People's burden all around. You understand that? Okay."

Later, after the jury was dismissed for the day, Dekalb's counsel argued that a mistrial was in order. He contended the prosecutor committed misconduct by her remarks, since she "knows full well that Mr. DeKalb does, in fact, have schizoaffective disorder bipolar type," including because he spent months during the pendency of the case being "treated precisely for that disorder," and, therefore, the prosecutor deliberately made false statements to the jury. The court rejected the misconduct claim because the prosecutor was entitled to argue from the evidence presented by Dr. Griffith and said

19

that any improper inference by the prosecutor did not rise to such serious misconduct as to require a mistrial.

The court appears to have agreed with Dekalb's counsel that the prosecutor's remarks had improperly shifted the burden to the defense to prove Dekalb had a bipolar disorder, but ruled that its re-instruction to the jury that the defense had no burden of proof cured the impropriety.

## 2. Legal Standards

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' (*Darden v. Wainwright* (1986) 477 U.S. 168, 181.)" (*People v. Davis* (2009) 46 Cal.4th 539, 612.) " '[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.' " (*People v. Dworak* (2021) 11 Cal.5th 881, 914 [regarding a prosecutorial misconduct claim].)

"By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the jury' (*People v. Price* (1991) 1 Cal.4th 324, 447) and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct" ' (*People v. Wallace* [(2008)] 44 Cal.4th [1032,] 1071). To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm. (*People v. Tafoya* [(2007)] 42 Cal.4th 147, 176.)" (*People v. Davis*, *supra*, 46 Cal.4th at p. 612.)

## 3. Analysis

Dekalb contends the prosecutor engaged in misconduct by using a hearsay statement—her reference to 5150 records indicating that Dekalb

20

displayed a goal-oriented and coherent thought process the day before the incident—under the guise of impeachment, arguing in closing that Dekalb was not bipolar when she knew he was in fact bipolar, and shifting the burden to prove intent to the defense, thereby deliberately misleading the jury into concluding Dekalb had the intent to commit burglary when he entered Andrea Z.'s house.

The parties debate various issues regarding Dekalb's misconduct claim, including the People's contentions that Dekalb forfeited the claim by failing to ask for an admonition below and, regarding the merits, that the prosecutor was merely commenting on the persuasiveness of Dr. Griffith's testimony and on the state of the evidence during closing argument.

We need not address these issues because, assuming solely for the sake of argument that the prosecutor engaged in misconduct and Dekalb preserved his claim for appeal, conclusions we do *not* reach here, the misconduct was harmless beyond a reasonable doubt for the same reasons that caused us to conclude that any trial court error regarding the prosecutor's impeachment of Dr. Griffith was harmless.

In addition, Dekalb gives us no reason to doubt that the trial court acted within its discretion when it concluded that its further instruction to the jury after closing argument that the prosecution alone bore the burden of proof cured any burden-shifting suggested by the prosecutor's rebuttal remarks argument about the defense failure to show Dekalb suffered from bipolar disorder. (See *People v. Schultz* (2020) 10 Cal.5th 623, 673–674 [" ' "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions," ' " which ruling is reviewed for abuse of discretion].)

## III. DISPOSITION

The judgment is affirmed.

STREETER, J.

WE CONCUR:

BROWN, P. J.
GOLDMAN, J.