Filed 2/6/25  P. v. Romo CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C097964 |
| Plaintiff and Respondent, | (Super. Ct. No. 18FE020906) |
| v. | |
| MIGUEL GARCIA ROMO, JR., | |
| Defendant and Appellant. | |

Defendant Miguel Garcia Romo, Jr., fatally shot his wife.  Identity was not an issue at trial.  His defenses were perfect and imperfect self-defense.  But the jury found him guilty of second degree murder and other related crimes, and the trial court found he had two strike priors.

Before us, defendant contends (1) the trial court erred in excluding evidence of the victim's intent to kill defendant; (2) the prosecutor's cross-examination of a defense expert witness regarding police and incident reports exceeded the allowable scope of

1

cross-examination and violated defendant's Sixth Amendment right of confrontation; (3) CALCRIM No. 851, an instruction that limits the use of expert testimony of intimate partner battering to the issues of self-defense, wrongfully precluded the jury from considering such evidence to determine whether defendant acted in the heat of passion; (4) cumulative error; (5) the evidence was insufficient to establish his strike priors; and (6) the abstract of judgment omits the trial court's waiver of certain fees.

We will remand for a retrial on the allegations of defendant's strike priors, and, as requested by the Attorney General, we will order the abstract of judgment be corrected to record that defendant's sentences are consecutive. In all other respects, we affirm.

FACTS AND HISTORY OF THE PROCEEDINGS

A.     Prosecution

1.     Eyewitnesses

Around 1:00 or 1:30 a.m. on October 31, 2018, Jesse F. was in front of a Starbucks and across the street from a Chevron/Burger King when he heard a woman scream, "He's got a gun." The scream came from the gas station. Jesse saw a car and a woman at the gas station, and the woman was quickly walking away from the car. Jesse lost sight of the woman, and then he heard six loud popping sounds coming from the station. He immediately went behind the Starbucks and called 911.

At about the same time, Patrick K. was a passenger in a van that had parked at one of the Chevron station's pumps. Seated in the van's back seat, Patrick noticed a man and a woman arguing on the other side of the pump. He heard the woman say, "Give me my kid. I just want my kid," "Stop," and "[H]e has a gun." The woman said the man had a gun in a "fairly terrified" voice. The man looked directly at Patrick and said, "[N]o, I don't." Patrick identified the man as defendant.

Defendant and the woman were associated with a white Charger stopped directly across from Patrick, and a gold car stopped near it. Patrick saw the two chase each other

2

around the vehicle. At one point, the woman pulled the gas nozzle out of the car and turned it in defendant's direction. Defendant picked it up and put it back in the "thing." Defendant chased the woman towards a building. Patrick heard approximately eight gunshots; first three, then two, and then three more. After the shots were fired, the white Charger left the area.

That same morning, S.B. was the clerk working at the Chevron station. He started work at 8:00 p.m. the prior evening. It was S.B.'s practice while working the night shift to lock the front doors and to open them only when a customer arrived at the station in a car. At about 1:30 a.m., a customer held the door open to admit defendant into the store. Defendant paid for gas with cash.

After defendant went out to pump gas, S.B. saw a woman yelling at defendant. S.B. went out and told them to leave. The woman did most of the yelling, as defendant would calm down and try to ignore her, but he also yelled at her at times. S.B. went inside and closed the doors. He later told officers that he saw the woman take something that looked like a roll of paper towels out of the car and throw it on the ground.

Defendant started chasing the woman. S.B. heard a ticking or clicking sound, and he saw the two people running. He heard shots fired in front of the building, and defendant and the woman were the only people outside and were right in front of him. S.B. ran behind the counter. He heard someone trying to open the front door, but the doors were locked. He heard a second set of shots and heard glass breaking at the Burger King next door. He saw the woman fall to the ground in front of the door. Defendant came up to her, and S.B. heard an additional shot. He ran to the back of the store and waited for police.

Jamal J. worked as the general manager of the adjacent Burger King. In the early morning of October 31, 2018, he was sitting in a booth next to a window. He heard arguing outside. He looked up and saw a woman running to a car. Defendant then started chasing her. The woman ran towards the Burger King, and Jamal heard her say, "stop."

3

Then Jamal heard gunshots. He saw a gun in defendant's hand. Defendant was by the gas pumps when Jamal first heard the shots, but then he came closer to the woman who had come up to the door, and he kept firing. The woman went down. One of the Burger King's windows was shot out. Defendant ran back to his car, put something in the trunk, and drove away.

## 2. Surveillance videos

Surveillance videos (Exhibits 1 and 48) taken at the Chevron station at the time of the crime were played for the jury and admitted into evidence. Together, they depicted the following: A white Dodge Charger pulled into the gas station and stopped alongside the pumps. A gold or beige sedan followed the Charger and stopped alongside it. The sedan pulled forward and parked in front of the Charger as defendant got out of the Charger's driver's side and walked towards the convenience store.

One of the store's customers held the door open for defendant to enter. Defendant was bald and was wearing a gray sweater or long-sleeved shirt. He went to the counter and gave the store clerk what looks like cash, and he then left the store. He walked back to the white Charger and opened and closed a driver's side door. The victim and driver of the sedan, later identified as defendant's wife, Shannon H., was standing on the other side of the closed door. Defendant removed the nozzle from the pump and inserted it into his car. He appeared to be refueling his car.

While refueling, defendant appeared to lunge at Shannon. She stepped back. Defendant opened one of the driver's side doors, and as he reached into the car, Shannon tried to close the door on him. Defendant stood up outside the car and closed the door. He walked toward Shannon, who ran around the car and back to the fuel nozzle. She pulled the nozzle out of the car and appeared to aim it at defendant, then dropped it on the ground in front of him and retreated to the car's passenger side.

4

Defendant picked up the nozzle and, while holding it, opened a driver's side door. He reinserted the nozzle into the car, and then he reached inside the car. Shannon walked back around to the nozzle. As defendant stood up, he charged at her briefly, and then gripped the nozzle. He appeared to have something in his left hand. Shannon pointed at him and looked away briefly.

As Shannon stepped toward him, defendant removed the gas nozzle from the car and appeared to threaten to hit her with it. He reinserted the nozzle as Shannon walked around the car. Defendant stepped over the nozzle hose and chased her around the car. Shannon closed the open driver's side door, pulled the nozzle out of the car, and threw it against the pump. Defendant appeared to push Shannon in the back, stopped running, picked up the nozzle, and reinserted it into the car. Shannon again pointed to him and turned as if she was talking to someone. She walked back to the car's passenger side.

As defendant continued refueling, he jerked as if he were going to chase Shannon, but he didn't. As he removed the fuel nozzle from the car, Shannon opened the Charger's trunk and threw what appears to be a roll of paper towels onto the ground. Defendant dropped the nozzle on the ground and started to chase her, but he stopped and closed the trunk, picked the nozzle up, and replaced it into the pump. Shannon ran past her car, and defendant gave chase. She turned and ran back past the gas pumps towards the convenience store, with defendant in pursuit.

Chasing Shannon, defendant appeared to be holding something in one or both of his hands. He chased Shannon towards the store as the Charger's trunk opened. Shannon attempted to open the store doors, but she could not because they were locked. She then fell to the ground. Someone approached her, and then left.

Defendant ran back to his car and threw something in the trunk. He picked up the roll of paper towels on the ground and threw it into the trunk. He closed the trunk, opened a driver's side door, and got into the car, and he drove away.

5

### 3. Investigation

Responding law enforcement found Shannon's body at the front door of the convenience store. A trail of blood led to her body. Officers found a shell casing near the body, a projectile near a garbage can that was to the right of the body, and a projectile inside the Burger King that had gone through a window.

Sacramento County Sheriff's Sergeant Ralph Garcia was at the scene at approximately 3:00 a.m., October 31, 2018. He walked around the pump areas to look for gasoline on the ground, but there was no area of ground that had a significant amount of gasoline. If there had been, he would have noticed it. The shooting had occurred at approximately 1:30 a.m. that morning.

### 4. Arrest and search of defendant and his Dodge Charger

Burbank Police Officer John Embleton was on duty the morning of October 31, 2018. At about 7:30 a.m., he was traveling on a freeway in Sylmar, Los Angeles County, when he came upon a three-vehicle collision. Defendant's white Dodge Charger was one of the damaged cars, and defendant was standing at the car's passenger door. Officer Embleton ran the cars' license plates, and he was advised that defendant's car was associated with a subject wanted for a homicide out of Sacramento County that day. Embleton requested additional units.

At that, defendant ran away across the freeway and up the embankment. Officer Embleton chased him across the freeway and ordered him to stop, but defendant didn't. He ran along the foot of the embankment, jumped a fence, and continued running on local streets. Embleton eventually brought him to the ground and placed him under arrest.

Defendant's white Charger was impounded. The following day, November 1, Sergeant Garcia searched the car in Burbank pursuant to a search warrant. He found seven cellular phones, a roll of paper towels in the trunk, and some jars containing

6

marijuana. He also found a gray sweatshirt or sweater in the car's back seat. The shirt did not smell like gasoline, something he would have noticed if it had. Also, there was no overnight bag or duffle bag in the car or anything that was consistent with someone traveling out of town or going on a vacation. When defendant was booked, he was carrying $6,801 in cash.

### 5. Autopsy

A forensic pathologist determined that Shannon died from multiple gunshot wounds. She suffered two gunshot wounds to the head. One bullet entered her right cheek and traveled through the skull and the brain, exiting on the left side of the head. The gun was fired approximately 18 to 24 inches away. It was a fatal wound. A second bullet entered near the back of her right ear at an angle and lodged in her scalp tissue. This wound could also have been fatal. Shannon also suffered a gunshot wound to the back of her left arm.

### B. Defense

Linda R., defendant's aunt, had seen Shannon hit defendant. At a casino in 2018, she saw Shannon ask defendant for money. Defendant said he did not have any more. Shannon slapped his face and walked away. About three months later at the casino, Shannon hit defendant on the side of his face with a drinking glass. Defendant stood up and asked what she was doing, but he did not retaliate. Linda said Shannon had a very short temper and had a reputation in the family for anger and violence.

Rafael C. had known defendant for over 30 years. He stated that Shannon was upset "all the time" and would harass or slap defendant because she believed he was cheating on her. She would also verbally abuse him. Defendant would yell back or try to block her to protect himself. Rafael never saw defendant put his hands on Shannon or hit her.

7

M.R. is defendant and Shannon's son. He testified that early on, Shannon would verbally abuse defendant, and they would argue and yell at each other. If defendant did not give her attention, she would try to push or poke him. Once, while defendant was driving, Shannon pulled his arm while they were arguing, and they got into a wreck. People in the car were hurt, but not severely.

M.R. stated that Shannon always started the confrontation. On too many occasions to count, defendant would try to leave, but she would throw things at him or chase him down. Numerous times, she threatened him with a knife. They were constantly fighting, and she hit, punched, and kicked him and verbally abused him. Defendant yelled at Shannon and physically retaliated at times, sometimes to protect himself. M.R. believed that because his parents' relationship was "so toxic," the death of Shannon could have gone either way.

A.R. is defendant and Shannon's daughter. She stated that both her father and her mother started the arguments between themselves. Shannon would try to hit defendant, pull his shirt, and scratch him. Defendant would push her off. Once, when the two were arguing, Shannon stabbed defendant in the lower back with a small knife.

At times, A.R. saw bruises on her mother, sometimes after her parents fought. Once, she saw defendant pin Shannon down on the ground and choke her. When people walked in on defendant and Shannon fighting, defendant acted like he had not done anything and would blame Shannon.

A.R. testified that defendant and Shannon had argued during the entire three days before the shooting. Around midnight or 12:30 a.m. on the night of October 30-31, 2018, the two argued, and A.R. saw them run outside. When A.R. walked out, Shannon walked back in the house holding a gun with a rag. As defendant went into the garage, A.R. asked Shannon why she was holding the gun. Shannon went into the garage. Defendant and Shannon continued arguing. Then defendant ran to his car, and Shannon ran to her

8

grandmother's car, and they both left. A.R. never saw Shannon point a gun at anyone that evening, nor did she see the gun with Shannon when Shannon drove away.

At no time did defendant tell A.R. he was moving to Arizona or going to visit relatives in Arizona. Also, at no point did she get some money and give it to defendant. Sometimes, defendant would have A.R. hold money for him and hide it from Shannon.

Defendant testified on his own behalf. In 2008, he was convicted of violating Health and Safety Code sections 11378 and 11379, possessing a controlled substance for sale and transporting a controlled substance for sale, respectively. In 2001, he beat a man with a metal steering wheel locking device. In 2007, defendant had gone to a relative's home to find Shannon after they had fought. The relative pushed defendant towards the back of the door to leave, telling him to get out. During the incident, the relative spit on defendant, so he slapped her. Before the jury was instructed, the parties stipulated that defendant was convicted of a felony prior to October 31, 2018.

Defendant and Shannon married in 2001. Infidelity on both parts resulted in physical fighting between them beginning when they were young. Shannon was violent with defendant a number of times. She stabbed him in the arm and in the back. She knocked him off his motorcycle and tried to run him over. She hit him on the head many times with bottles. She kicked him in the eye. She punched out the windshields in his cars and sliced his motorcycle's tires.

Shannon would go through "blind rages" where she would attack defendant. He would bear hug her and get her to calm down, but once he let her go, she would continue attacking him. Shannon also stalked defendant. She would see his cars at people's houses and slice the tires. She threatened to call the police on him for no reason and would make false 911 reports.

While defendant was incarcerated, Shannon started a relationship with another person. After defendant was released in 2016, he eventually returned to live with Shannon in her apartment. But he learned she was using methamphetamine, and she

9

confessed she was getting the drug from the person she had met while defendant was in prison. Defendant moved out of the apartment with his son, and they moved into Shannon's grandmother's house.

By the time of the shooting, Shannon had also moved in with her grandmother and defendant. Defendant testified that on the evening of October 30, 2018, he fell asleep on a couch in the garage. Shannon went through his pants pockets and found a phone number for a woman. She woke defendant up by hitting him with his phone and asking about the girl. Defendant said she was a friend's girlfriend, but Shannon thought the number was for another girl. To stop her from fighting and throwing things at him, defendant took her to his friend's house, and the friend confirmed the number was his girlfriend's. But Shannon did not believe that.

Back at home, Shannon went into a rage. Defendant tried to leave, but Shannon grabbed his car keys, jumped in his car, and took off. Defendant ran towards the car, and as he reached it, Shannon pointed a gun at him and told him to "get the fuck away from the car." As he walked back to the house, his daughter confronted him. She was angry he had taken Shannon's phone, and she started hitting him. He hugged his daughter and pushed her out of the way. He grabbed a bike from the garage and rode to one of his friend's house.

Defendant stayed at the friend's house until about 1:00 a.m. to let the situation die down, and then he returned home. He grabbed his keys off the kitchen counter, went into the garage, and began filling two bags with clean clothes. He also found a wad of money Shannon had taken from him. A.R. got up and opened the garage door. He told her he was "going to Arizona to grandma Martha's house to get away from your mom." He jumped in his car and took off.

Defendant stopped at the Chevron station to get gas, not realizing Shannon had followed him. He went inside the store and paid for gas, and when he walked out of the store, he recognized Shannon's car. As he began refueling the car, Shannon stepped out

10

of her car and walked toward him with a gun.  She demanded he give her "the money."
He told her he was "getting out of here" and leaving, but she said he was not going
anywhere.

Shannon looked at a neighboring van when its door opened.  At that moment,
defendant grabbed the gun, hit Shannon's hands between his car door or on the hood, and
took the gun from her.  She screamed that he had a gun.  Defendant tried to put the gun
on the seat inside his car, but Shannon slammed the car door on his legs.  He put the gun
in his pants because he knew she would try to get it if he left it in the car.

At some point, Shannon pulled the gas nozzle out of defendant's car.  She pointed
it at defendant and sprayed gas on his chest.  The gas dripped down to his pants, wetted
his shoes, and left a puddle on the ground.  Shannon "gouged" him with gas.  Shannon
told him she was going to light him on fire and blow him up.  Defendant put the nozzle
back in the car, but she pulled the nozzle out again.  As she did, it sprayed gas on his car's
back hood and windshield, and the gas rolled down into his trunk.  She said the gas was
going to reach his trunk so she could blow him up.  Moments later, she opened the trunk,
removed a roll of paper towels, and acted as if she had a lighter in her hands and was
going to light something on fire.  Defendant stated he was scared for his life.

Defendant heard a bang or pop, and he believed Shannon had lit something on fire.
She ran "for dear life" saying he was going to blow up.  Defendant ran in the same
direction that she was running for safety, believing he was running away from where the
noise had originated.  But after watching the surveillance videos, he realized she had
punched out his rear side window with her hands.  Defendant fired the first two shots
after she had turned around and he saw she had a lighter in her hand and could still light
him on fire.  Still running in fear and believing she could light him on fire, he fired two
more shots.

Shannon ran up to the store's doors, but she could not get in.  Defendant saw her
drop.  In many past fights, she would play possum like she was not going to do anything,

and as soon as he let her go or turned his back, she would attack him. When she fell in front of the doors, he believed she was playing possum. He did not know if she had been hit by any of the prior shots. As he approached her, he saw the lighter "on the floor." Shannon turned over to grab it, and he fired one more shot.

Defendant had believed he was still in danger because she had the lighter in her hand. He also thought the last shot would scare Shannon, and he would be able to escape. He ran back to his car and drove away.

Defendant left Sacramento for his family's house in Arizona. Along the way, he threw the gun out the window. He did not remember where. After the accident occurred in Burbank, he got out of the car and was standing to the side when he saw an officer look at him and reach for his gun. Defendant got scared and ran.

Dr. Linda Barnard, a licensed marriage and family therapist, testified as an expert on intimate partner battering (IPB). IPB was derived from battered women's syndrome upon experts realizing that women were not the only victims of domestic violence. Men and children may also be victims. IPB is thus more gender inclusive.

Dr. Barnard stated that a battered person is one who experiences physical, verbal, psychological, or sexual abuse within an intimate relationship. In such a relationship, essentially one person wants to have power and control over the other person. The person will obtain that control through a variety of abusive means.

About two-thirds of violent relationships exhibit a cycle of violence. Increasing tension in the relationship ultimately leads to an episode of violence or psychological abuse, which gets followed by apologies and promises not to engage in the behavior again. This "honeymoon" or tranquil period gets followed by increasing tension, and the cycle repeats. Each stage causes different psychological effects on the victim, from denial to anxiety and depression and to fear as the abuse escalates.

The physical abuse is a small part of what happens in abusive relationships. The rest of the time, the perpetrator will exhibit other control behaviors, such as financial

12

abuse, isolation, threats, coercion, and using the children against the victim. Over time, the verbal and psychological abuse diminishes the victim's self-worth. It is possible for a person to be both a victim and a batterer. Statistically, males more often abuse females, but there are many cases that are the opposite.

Often, the victim will accommodate the abuse over time, allowing more abuse and thinking it is normal. The victims will lose belief that they have the ability to leave, make decisions, or change their circumstances. Many victims develop posttraumatic stress disorder because they get stuck in a trauma cycle that goes beyond their ability to cope.

Dr. Barnard conducted an evaluation of defendant. She reviewed police reports, videos, and recordings, and she interviewed defendant and spoke with his daughter A.R. From this process, she concluded that defendant had experienced being a victim of intimate partner battering. Many such victims behave in a hypervigilant way, or they may see danger where another person who had not experienced abuse may not see danger.

Dr. Barnard opined that Shannon had also experienced intimate partner battering. There was mutual abuse between defendant and Shannon.

C.    Verdict and sentence

A jury found defendant guilty of second degree murder (count 1), shooting at an occupied building (count 2), and being a felon in possession of a firearm (count 3). (Pen. Code, §§ 187, subd. (a); 246; 29800, subd. (a)(1) [statutory section citations that follow are found in the Penal Code unless otherwise stated].) The jury also found true an enhancement associated with count 1 that defendant personally discharged a firearm, causing Shannon's death. (§ 12022.53, subd. (d).) The trial court found true allegations that defendant had two prior strike convictions.

The court sentenced defendant to a prison term of 95 years to life: 45 years to life on count 1 (15 years to life tripled), plus 25 years to life for the firearm enhancement and another 25 years to life on count 2. The court stayed execution of punishment on count 3 pursuant to section 654.

## DISCUSSION

## I

### *Exclusion of Statements by Shannon Showing Her Intent to Kill Defendant*

The trial court refused to admit a statement by Shannon to defense witness Rafael that she would kill defendant if he ever left her and statements by her to her therapists that she harbored compulsive and uncontrollable anger towards defendant. Defendant contends the court erred because the hearsay statements were admissible under Evidence Code section 1250 as evidence of Shannon's state of mind.

A.    Background

1.    Statement to Rafael

During direct examination of Rafael, defense counsel asked whether Shannon told Rafael what she would do if defendant ever left her. Rafael responded, "Well, one time." The prosecutor objected on hearsay grounds, and the court sustained the objection. It ruled that whatever Shannon said to Rafael would be hearsay unless it was admissible under an exception to the hearsay rule.

Defense counsel argued the evidence was admissible as evidence of Shannon's state of mind and state of mental intent. The prosecutor countered that whether Shannon shared her state of mind with Rafael was not relevant for the purpose for which defendant was trying to introduce it. The trial court sustained the objection without further explanation.

## 2. Statement to therapists

During direct examination of Dr. Barnard, defense counsel asked how she began an evaluation. Barnard stated she gathered and reviewed all the documentation that was shared between attorneys' offices. That documentation included police reports, witness statements, and mental health records if relevant. Counsel asked Barnard what kind of documents were available for her evaluation of defendant. The prosecutor objected, and an unreported sidebar conference was held.

During cross-examination of Dr. Barnard, the prosecutor sought to establish that the witness did not review a number of police reports concerning defendant. After Barnard said she had reviewed one police report of alleged prior abuse, the prosecutor asked if defense counsel had given her any other police reports regarding prior abuse. Barnard said she did not think so.

The prosecutor then asked Dr. Barnard whether defense counsel had presented her with a report from June 16, 2006. Defense counsel objected on the grounds of hearsay and undue prejudice. The trial court excused the jury. It offered to have Barnard read the reports the prosecution possessed, and then the prosecution could ask her about them.

Defense counsel argued the reports were not relevant and contained hearsay. The court replied that everything the defense had given Barnard was hearsay, stating, "Good for the goose." Defense counsel responded, "You're right. And that's why the psych report and what [Snannon] says in that report is so relevant." The court said that was different because the prosecution had represented that such a report had been illegally obtained. Defense counsel disputed that assertion.

## 3. Post-trial motion

More than a month after the jury rendered its verdicts, defense counsel filed a motion to admit hearsay statements made by Shannon. In the motion, counsel explained that during trial, he had sought to introduce the hearsay statements through Rafael and Dr.

15

Barnard. He had announced the defense would be claiming self-defense, and he would be producing evidence of Shannon's violent character under Evidence Code section 1101, subdivision (a). But the prosecutor had objected to the statements on the basis of hearsay, and the trial court had sustained the objections. The matters were discussed in two separate sidebar conferences, but those were not placed on the record. Counsel had stated at the time he wanted to place the objections and rulings on the record with the justifications. The motion's purpose was to place on the record counsel's objections and his reasons why the evidence should have been admitted in a case involving self-defense.

Defense counsel stated that Rafael would have testified that Shannon told him, " 'If he [defendant] ever tried to leave me, I will kill him.' " Counsel argued that even if Evidence Code section 1101, subdivision (a) was not used, the trial court should have admitted this statement pursuant to Evidence Code section 1250 as a reflection of Shannon's state of mind and to explain her actions and intent on the night of the incident.

Also in the motion, defense counsel alleged that Shannon had attended a batterers' treatment program from July through September 2018 to deal with her anger issues. During meetings with her counselors, Shannon stated she had compulsive and uncontrollable anger towards defendant, her husband. She had an episode of extreme anger on the morning of July 30, 2018, where she threw things, yelled insults, and used text messaging to express verbal aggression after he left the house. She explained she has two kinds of dangerous anger outbursts because of her trust issues with her husband. She has spells of overwhelming anger and has gone so far as to be arrested for her actions towards her husband.

Defense counsel argued that Shannon's statements to her therapists were admissible under Evidence Code section 1250 to describe Shannon's state of mind on the night of the shooting and to corroborate defendant's need to use self-defense. Counsel asked the trial court to respond to the motion by entertaining a motion for new trial or allowing the motion to be included in the record.

16

The trial court acknowledged the parties had discussed during trial putting defense counsel's arguments on the record. The prosecutor stated the motion was appropriate to allow defense counsel to put his objections to the court's rulings on the record. The court agreed with defense counsel that his objections were considered in the sidebar conferences and were not put on the record. The court announced the motion would be made a part of the record to preserve counsel's objections.

B.    Analysis

Evidence Code section 1250 is an exception to the hearsay rule that renders evidence of a declarant's state of mind admissible. It provides that evidence of the declarant's "then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when  [¶]  (1) [t]he evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or  [¶]  (2) [t]he evidence is offered to prove or explain acts or conduct of the declarant." (Evid. Code, § 1250, subd. (a).)  To be admissible under this statute, the evidence of the statement must be trustworthy, and the declarant's mental state or conduct must be placed at issue. (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 884; Evid. Code, §§ 1250, subd. (a)(1); 1252.)

In a homicide case where the defendant claims self-defense, he places the victim's state of mind at issue. (*People v. Spencer* (1969) 71 Cal.2d 933, 945.)  "[A] claim of self-defense requires the trier of fact to find that the other party was the aggressor[.]" (*Id*. at pp. 945-946; *People v. Romero* (2007) 149 Cal.App.4th 29, 38.)  Because a claim of self-defense raises a question of fact as to whether the victim was the aggressor, a victim's hearsay statement relevant to that issue is admissible under Evidence Code section 1250, subdivision (a)(2) " 'to prove or explain [her] acts or conduct.' "  (*Spencer*, at p. 946, fn. omitted.)

By claiming self-defense, defendant put Shannon's state of mind at issue. The jury had to determine whether she was the aggressor. Because Shannon's state of mind was at issue, her hearsay statements to Rafael that she would kill defendant if he ever left her and to her therapists of her anger towards defendant were relevant and admissible under Evidence Code section 1250 unless they were made under circumstances indicating their lack of trustworthiness or were rendered inadmissible by other hearsay rules. (Evid. Code, § 1252.)

We turn first to defendant's claim that the trial court erred by not admitting Shannon's statements to her therapists. The Attorney General contends defendant has forfeited this claim because the record does not indicate whether defense counsel raised the issue at trial or whether the trial court actually ruled on it. However, defendant put his objections on the record with his post-trial motion, and the prosecutor agreed the motion was appropriate and did not object to defendant's contention that the trial court had denied his request to admit Shannon's statements to her therapists. The issue thus is not forfeited.

Nevertheless, the trial court did not err by excluding Shannon's statements to her therapists from evidence. As the Attorney General argues, the statements to the therapists involved two levels of hearsay. The first level was Shannon's out-of-court statements to the therapists. The second level was the therapists' report of the statements, which defense counsel wanted Dr. Barnard to relay to the jury.

Double hearsay is admissible if each level of hearsay comes within an exception to the hearsay rule. (*People v. Riccardi* (2012) 54 Cal.4th 758, 831, abrogated on another ground in *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.) Assuming Shannon's statements to her therapists could qualify for admission under Evidence Code section 1250, defendant has not established a second level hearsay exception that would allow Dr. Barnard to relay Shannon's statements to the jury as they were reported in the therapists' report.

18

Indeed, unless Dr. Barnard personally heard Shannon's statements to her therapists, she could not testify to them as a basis for her expert opinion. As we discuss more fully below, an expert witness is generally not permitted to supply case-specific facts about which she has no personal knowledge unless they can be admitted under an applicable hearsay exception. (*People v. Sanchez* (2016) 63 Cal.4th 665, 684.) Defendant has offered no exception that would apply to Barnard's report of Shannon's statements to her therapists. The trial court thus did not commit error in excluding those statements from evidence.

As for Shannon's statement to Rafael, the Attorney General contends the trial court did not err in excluding the statement because defendant did not show the statement was trustworthy or relevant by establishing a foundation for admitting the evidence. The prosecutor did not raise this objection at trial. It objected only on the grounds of hearsay. Because the trial court sustained the objection and excluded the evidence on that basis, defendant had no opportunity to lay a foundation to establish the statement's trustworthiness. Any offer of proof usually required to preserve an evidentiary ruling for appeal was futile and was not a prerequisite for challenging the trial court's ruling on appeal. (*Beneficial Fire & Casualty Ins. Co. v. Kurt Hitke & Co.* (1956) 46 Cal.2d 517, 522; *People v. Schmies* (1996) 44 Cal.App.4th 38, 54, fn. 9.)

Nevertheless, assuming for purposes of argument that the trial court abused its discretion by not admitting Shannon's statement to Rafael pursuant to Evidence Code section 1250, we conclude the error was not prejudicial. We may declare the erroneous exclusion of evidence to be a miscarriage of justice only when, after examining the entire cause and the evidence, we conclude it is reasonably probable the jury would have reached a decision more favorable to defendant had the error not occurred. (*People v. Richardson* (2008) 43 Cal.4th 959, 1001; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

Having reviewed the record, we conclude that if the evidence of Shannon's statement to Rafael, that she would kill defendant if he left her, had been admitted, it is

not reasonably probable the jury would have reached a verdict more favorable to defendant. The jury heard of numerous times that Shannon threatened defendant with deadly harm and actually harmed him with deadly weapons. According to defendant, Shannon threatened him with a knife numerous times. She stabbed him in his back and in his arm. She knocked him off his motorcycle and tried to run over him. She hit him on the head with a bottle many times. She kicked him in the eye. She pointed a gun at his face and demanded to know who he was sleeping with.

Defendant testified that more lethal threats occurred on the night of the shooting. He said that after Shannon got in his car to leave the house, he approached her. But she pointed a gun at him and told him to get away from the car. At the Chevron station, she walked up to him while holding a gun and demanded that he give her the money he took. He told her he was leaving, but she said he was not going anywhere. Defendant grabbed the gun from her only after she was distracted, and he was able to hit her hands on the car door. But then Shannon doused defendant and his car with gasoline and threatened to immolate him. In light of all this evidence of Shannon threatening to kill defendant, it is not reasonably probable that the jury would have reached a different verdict had it heard of another statement by Shannon threatening to kill defendant.

Moreover, despite all this evidence, the jury concluded that Shannon was not the aggressor, and that defendant could not have reasonably believed she was. Other evidence refuted defendant's testimony. None of the surveillance videos depicted Shannon with a gun. None of the percipient witnesses said Shannon had a gun. Despite defendant's claim that he was soaked with gasoline, Sergeant Garcia did not notice any significant amount of gas on the ground less than two hours after the shooting. The clothes found in defendant's car that matched those the surveillance videos showed him wearing did not smell of gasoline. The surveillance videos do not depict Shannon spraying gas on defendant's car. Rather, they show she threw the gas nozzle in the

opposite direction at the gas pump. And no evidence of a lighter was found at the scene of the shooting.

More significantly, the surveillance video evidence showed that defendant was the aggressor. The videos do not show that defendant ever feared Shannon. For example, when Shannon first walked up to defendant at the gas station, he simply placed the gas nozzle in his car as Shannon stood nearby. Defendant lunged at *her*, and she backed up.

Later, defendant chased Shannon around his car. During the chase, Shannon took the gas nozzle out of defendant's car, pointed it at defendant, and tossed it in his direction. This did not scare defendant. He picked up the nozzle and reinserted it, reached into his car, and then stepped toward Shannon, who backed away. At this point, defendant appeared to have something in his left hand.

Moments later, defendant removed the gas nozzle from the car and appeared to threaten to hit Shannon with it. He reinserted the nozzle as Shannon walked around the car. Defendant stepped over the nozzle hose and chased her around the car. Shannon closed the open driver's side door, pulled the nozzle out of the car, and threw it against the pump. Defendant appeared to push Shannon in the back, stopped running, picked up the nozzle, and reinserted it into the car.

Roughly a minute later, defendant chased Shannon through the gas station and toward the convenience store. Defendant appeared to be holding something in one or both of his hands. Seconds later, Shannon tried to open the convenience store's door but could not. Then she fell to the ground. Someone approached her and left. Shannon had not been a threat to defendant at the Chevron station.

After the shooting, defendant did not act like someone who had just engaged in self-defense. He ran back to his car, got in, and immediately drove away. He fled towards Southern California, got rid of the gun, and fled on foot from law enforcement after his car collision in Sylmar.

21

Given the overwhelming nature of the evidence against defendant, it is not reasonably probable he would have received a more favorable verdict had the jury heard that Shannon once told Rafael she would kill defendant if he left her. We thus conclude that the court's exclusion of Shannon's statement to Rafael was not prejudicial error.

II

*Cross-examination of Dr. Barnard*

Defendant contends the prosecution's cross-examination of Dr. Barnard regarding police reports she did not review as part of her analysis exceeded the breadth of cross-examination under Evidence Code section 721, subdivision (a), and violated his Sixth Amendment right to confrontation.

A.    Background

As stated above, during cross-examination of Dr. Barnard, the prosecution sought to establish that she did not review a number of police reports concerning defendant. After Barnard said she had reviewed one police report of alleged prior abuse, the prosecutor asked if defense counsel had given her any other police reports regarding prior abuse. Barnard said she did not think so.

The prosecutor asked Dr. Barnard whether defense counsel had presented her with a report from June 16, 2006. Defense counsel objected on the grounds of hearsay and undue prejudice. The trial court excused the jury. It offered to have Barnard read the reports the prosecution possessed, and then the prosecution could ask her about them. The prosecutor said that would not be practical, as the number of report pages not given to Barnard was "voluminous."

Defense counsel argued the reports were not relevant and contained hearsay. The court replied that everything the defense had given Dr. Barnard was hearsay. The prosecutor argued that she was not offering the additional reports for their truth. She

would ask the witness only if she had received or reviewed a police report of a particular date.

Counsel argued that if the prosecutor asked Dr. Barnard if she had reviewed a report, that would mean the report should have been reviewed. The court stated it probably should have been reviewed. The court continued: "Mr. Staten [defense counsel], you deliberately or your predecessor who hired this particular expert, somebody from the defense did not turn these over to the expert to review. I don't know if that was strategic or an accidental, but either way, any time an expert could have reviewed relevant information and did not, it's relevant to the opinion. [¶] . . . [¶] If there was relevant information that she didn't review, it's not through any fault of hers, but if she didn't review it, the jury can consider that in evaluating the strength of her opinion."

After further argument about the propriety of Dr. Barnard reading reports containing the victim's allegedly unsubstantiated statements of abuse by defendant, the court asked if it would be better for the prosecution just to ask the witness if she considered these reports and have the witness answer no. The prosecutor agreed that would be easier. The court stated that was how they would proceed. Counsel was concerned the prosecutor would state the subject of the report, such as domestic violence. The prosecutor clarified she would ask only whether the witness reviewed a particular police report without stating the nature of the incident reported. The court stated the expert could be asked questions about what she did or did not review that might be relevant to the case.

After the jury was brought back, the prosecution's cross-examination of Dr. Barnard continued as follows:

"Q Dr. Barnard, in addition to the offense report in this case, you indicated that you reviewed one Roseville Police Department report that was dated January 4th of 2017, correct?

"A Correct.

23

"Q     And you did not review any other police reports or incident reports because they were not provided to you, correct?

"A     Correct.

"Q     So specifically you did not review a report from Roseville Police Department dated June 16th of 2006?

"A     Correct.  I did not.

"Q     June 30th of 2007?

"A     No.

"MR. STATEN:  Judge, objection.  She's going through every report.  I thought we had --

"THE COURT:  No.  I ruled that she could.

"MR. STATEN:  Even though -- objection.  Hearsay.

"THE COURT:  Overruled.

"MR. STATEN:  352.

"THE COURT:  Overruled.

"BY MS. FRANKLIN [the prosecutor]:

"Q     A report dated December 4th of 2017?

"A     No, I didn't.

"MR. STATEN:  Objection.  Hearsay as well as 352.

"THE COURT:  Overruled.

"BY MS. FRANKLIN:

"Q     A report dated June 4th of 2018?

"A     No.

"MR. STATEN:  Hearsay, 352.

"THE COURT:  Overruled.

"BY MS. FRANKLIN:

24

"Q      You also did not review any what we describe as incident reports which are something less than a police report but are kept by police departments?

"MR. STATEN:  Calls for speculation.  Not within her knowledge.

"THE COURT:  Overruled.

"BY MS. FRANKLIN:

"Q      Did you review anything like that?

"A      No, I didn't.

"Q      If those had been -- if additional reports had been provided to you by the defense, would you have reviewed those in consideration of writing your report?

"MR. STATEN:  Calls for speculation.

"THE COURT:  Overruled.

"THE WITNESS:  Yes, I would.

"BY MS. FRANKLIN:

"Q      The defense provided you a RAP sheet for the victim in this matter, [Shannon], correct?

"A      Yes.

"Q      But they failed to provide you with a RAP sheet for Mr. Romo, correct?

"A      Correct.

"Q      Would you have reviewed that had that been provided to you?

"MR. STATEN:  Getting into hearsay.  352 as to what a RAP sheet may have, its value.

"THE COURT:  Why don't you lay a foundation to see if this witness knows what a RAP sheet is first.

"BY MS. FRANKLIN:

"Q      What is a RAP sheet, if you know, Dr. Barnard?

"A      I don't really know what the initials stand for, but it's someone's criminal history basically.

"Q      It's kept in a formal manner, right?

"MR. STATEN:  Leading.  Calls for speculation.

"MS. FRANKLIN:  It's cross.

"THE COURT:  I was going to say, one, she's an expert, and two, this is cross-examination.  In both cases, leading is perfectly okay.

"MR. STATEN:  But -- okay.

"BY MS. FRANKLIN:

"Q      You understand a RAP sheet to be a formal accounting or keeping of somebody's criminal history, correct?

"A      Correct.

"MR. STATEN:  Objection.  Hearsay.

"THE COURT:  Overruled.

"MR. STATEN:  352.

"THE COURT:  Overruled.

"BY MS. FRANKLIN:

"Q      In this matter, if a RAP sheet exists for the defendant, Mr. Romo, and had been provided to you, would that have been something you would have reviewed and considered for preparation of your report?

"A      Yes.

"Q      But that was not done in this case, correct?

"A      Pardon me?

"Q      That was not done in this case?

"A      No."

Minutes later, the prosecutor asked Dr. Barnard:

"Q    So hypothetically, if you had been provided with a history of Mr. Romo abusing his wife, [Shannon], would that have changed how you -- who you interviewed, for instance?

"MR. STATEN:  Calls for speculation.

"THE COURT:  Well, she's an expert, and she's going to give us an opinion about what she would do as an expert.  So I don't think that can be speculation.

"MR. STATEN:  But it's based on a faulty hypothetical that may not be true and factual.

"THE COURT:  Overruled.

"BY MS. FRANKLIN:

"Q    Do you remember the question?

"A    I don't.

"Q    I don't either.  I think it was something in the vein of, if you had been provided -- hypothetically, if you had been provided reports that indicated that Mr. Romo abused his wife, [Shannon], could that have changed maybe how you proceeded with writing your report?

"MR. STATEN:  Same objections.  Speculation, 352.

"THE COURT:  Overruled.  You can answer.

"THE WITNESS:  I was aware already through different reports that he had abused her.  So, I mean, I could have read additional things, and certainly if they had been provided, I would have read them, but I already knew that he had also abused her.

"BY MS. FRANKLIN:

"Q    Okay.  But your job here wasn't to determine whether [Shannon] was also -- had also been subjected to intimate partner battering; that wasn't your job here, right?

27

"A     Well, my job is to look at the whole context, and in that instance, then I actually do and I am interested in who all are victims and how that plays out. So I am interested in whether she's also a victim, and my conclusion was that -- I mean, nobody asked me because she's not on trial here, but I know that she had experienced intimate partner battering.

"Q     You know that she did also experience intimate partner battering is what you're saying?

"A     Yes.

"Q     And that in this situation, even based on the limited information you had, there was mutual abuse, correct?

"A     Yes."

B.     Analysis

The Attorney General argues defendant has forfeited his contentions that the cross-examination exceeded the scope allowed under Evidence Code section 721 and violated his right of confrontation. He did not object to the prosecutor's questioning at trial on those grounds. We agree.

Not objecting at trial on the ground raised on appeal forfeits the objection. (*People v. Townsel* (2016) 63 Cal.4th 25, 57 (*Townsel*).) Even claims based on the confrontation clause are forfeited on appeal if that objection was not raised at trial. (See *People v. Redd* (2010) 48 Cal.4th 691, 730.) Defendant's hearsay objections did not preserve a claim under the confrontation clause. (*Ibid.*)

Defendant acknowledges he did not object to Dr. Barnard's cross-examination on Sixth Amendment grounds. However, he asserts his hearsay objections were sufficient to preserve his constitutional claim because, under *People v. Gutierrez* (2009) 45 Cal.4th 789 (*Gutierrez*), constitutional contentions are not forfeited when " 'the new arguments do not invoke facts or legal standards different from those the trial court was asked to

28

apply, but merely assert that the trial court's act or omission, in addition to being wrong for reasons actually presented to that court, had the legal consequence of violating the Constitution[.]' " (*Id*. at p. 809.) Defendant claims his confrontation clause claim does not invoke different facts or standards from what the trial court applied on his hearsay objections.

The California Supreme Court, however, has narrowed *Gutierrez's* holding. In *People v. Rangel, supra*, 62 Cal.4th 1192, the court clarified that when an appellant argues for the first time on appeal that the admission of evidence violates his right under the confrontation clause against the admission of testimonial hearsay, which is what defendant raises here, "the relevant inquiry is not, as some of our cases might be read to suggest, whether the defendant's *Crawford*[1] challenge relies on the same facts and legal standards as a challenge made on hearsay or other state law grounds. (*See People v. Gutierrez* [*supra*,] 45 Cal.4th [at pp.] 809, 812 [].) . . . A *Crawford* objection generally requires a court to consider whether statements are testimonial, and, if so, whether a witness was unavailable and the defendant had a prior opportunity for cross-examination. This invokes different legal standards than, for example, a hearsay objection, which generally requires a court to consider whether the foundational requirements for admission of particular hearsay have been satisfied." (*Rangel*, at pp. 1216-1217.) Thus, hearsay objections are insufficient to preserve a Sixth Amendment claim. (*San Diego Police Dept. v. Geoffrey S*. (2022) 86 Cal.App.5th 550, 574.)

In any event, even when we consider defendant's argument on its merits, we conclude the trial court did not abuse its discretion in allowing the prosecution to ask Dr.

---

**1** *Crawford v. Washington* (2004) 541 U.S. 36, 59-60, 68 (*Crawford*). Defendant raises his confrontation clause claim under *People v. Sanchez, supra*, 63 Cal.4th 665, which is an application of *Crawford* to the relating of case-specific hearsay by expert witnesses under California law. (*Id*. at p. 670.)

29

Barnard about the reports she did not view. Defendant contends the cross-examination regarding the reports Dr. Barnard did not review was improper because it invited the jury to speculate about the nature of the reports' contents, particularly in light of the hypothetical question posed to Barnard of whether she would change her opinion had she been provided reports of defendant's abuse. And to the extent the examination caused the jury to infer the reports contained abuse allegations against defendant, it violated his Sixth Amendment right to confrontation.

An expert witness may be cross-examined not only to the same extent as any other witness, but she may also be questioned regarding her qualifications, the subject to which her testimony relates, the matter upon which her opinion is based, and the reasons for her opinion. (Evid. Code, § 721, subd. (a).) " 'The scope of cross-examination permitted under [Evidence Code] section 721 is broad, and includes examination aimed at determining whether the expert sufficiently took into account matters arguably inconsistent with the expert's conclusion.' " (*Townsel, supra*, 63 Cal.4th at p. 55.) " 'It is common practice to challenge an expert by inquiring in good faith about relevant information, including hearsay, which he may have overlooked or ignored.' " (*Id.* at p. 56.)

"[A]n adverse party may bring to the attention of the jury that an expert did not know or consider information relevant to the issue on which the expert has offered an opinion." (*People v. Doolin* (2009) 45 Cal.4th 390, 434.) " '[A] prosecutor may bring in facts beyond those introduced on direct examination in order to explore the grounds and reliability of the expert's opinion.' " (*People v. Peoples* (2016) 62 Cal.4th 718, 746.) The cross-examination of Dr. Barnard was well within these limits and the scope of Evidence Code section 721.

The Sixth Amendment's confrontation clause limits the extent to which an expert witness may testify of hearsay evidence she relied on. To support her opinion, an expert may relate to the jury background information on which she bases her opinion that is

technically hearsay, including general knowledge and premises generally accepted in her field. (*People v. Veamatahau* (2020) 9 Cal.5th 16, 21; *Sanchez, supra*, 63 Cal.4th at p. 685.) However, the expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Sanchez,* at p. 686.) This includes information contained in police reports authored by others. (*People v. Garcia* (2020) 46 Cal.App.5th 123, 167.) This limitation applies to expert testimony whether given during direct examination or cross-examination. (*People v. Malik* (2017) 16 Cal.App.5th 587, 597-598 (*Malik*).)

Defendant acknowledges the prosecutor did not and could not introduce the police reports' contents because they contained case-specific testimonial hearsay. But he argues that by asking Dr. Barnard about the police reports she did not review, the prosecutor was able to insinuate the existence of evidence of abuse by defendant that the prosecutor could not properly bring before the jury. Defendant relies on *Malik, supra*, 16 Cal.App.5th 587, and *Hardnett v. Marshall* (9th Cir. 1994) 25 F.3d 875 to support his argument that the prosecutor's questions violated his right of confrontation. Both cases are distinguishable.

In *Malik*, Dr. Barnard testified as a defense expert witness on post-traumatic stress disorder (PTSD). (*Malik, supra*, 16 Cal.App.5th at pp. 590, 592.) During cross-examination, the prosecutor asked Barnard to state what she had reviewed in making her assessment. Barnard stated she reviewed, among other things, a number of police and sheriff's reports. (*Id*. at p. 594.) Over objections, the prosecutor described the factual contents of five of those reports and asked Barnard if she had taken those facts into consideration in forming her conclusions. Barnard had. (*Id.* at pp. 594-595.)

A panel of this court ruled that the prosecutor's questions had violated the defendant's right of confrontation. (*Malik, supra*, 16 Cal.App.5th at pp. 597-598.) "[W]e have found no authority standing for the proposition that the breadth of permissible cross-examination extends to the admission of case-specific testimonial hearsay in violation of

a defendant's right of confrontation." (*Id.* at p. 597.) The statements in the police reports were case specific and testimonial. They related to whether the defendant suffered from PTSD at the time of the charged crime, and they were compiled during police investigations of the crimes. Because there was no showing of unavailability or that the defendant had or had not forfeited a prior opportunity for cross-examination, admitting the statements violated the defendant's right of confrontation. (*Id.* at p. 598.)

In *Hardnett*, a case decided before *Crawford* and *Sanchez*, the prosecutor impeached the defendant on cross-examination by asking whether a codefendant who did not testify was lying if she had made specific statements that contradicted the defendant's testimony. For example, the prosecutor asked the defendant if it wasn't true that he wanted the codefendant to "start boosting and she said no and you started slapping her around at Fisherman's Wharf?" (*Hardnett, supra*, 25 F.3d at p. 878.) When the defendant said no, the prosecutor asked, "So if [the witness] told Inspector Gerrans that[,] she would be lying, is that correct?" (*Ibid.*) Similar questioning happened three more times. (*Ibid.*)

The Ninth Circuit Court of Appeals ruled that the prosecutor's questions violated the defendant's right of confrontation. By introducing in the form of questions the statements made out of court by the codefendant, the prosecutor introduced hearsay by the words of a witness whom the defendant could not cross-examine because the witness had invoked her privilege against self-incrimination and was not a witness at trial. (*Hardnett, supra*, 25 F.3d at p. 879.)

The state argued that because the prosecutor's references to the out-of-court statements were in the form of questions, there was no evidence submitted by the prosecution as to their contents. (*Hardnett, supra*, 25 F.3d at p. 879.) The Court of Appeals disagreed: "[T]he effect of the prosecutor's questions was to insinuate not at all subtly that he had in his possession statements by [the codefendant] that corresponded to the statements he put in the form of questions. Evidence could have been disputed. The

prosecutor's remarks instilled a poison which the defense could not drain from the case." (*Ibid.*)

Unlike in *Malik* and *Hardnett*, the prosecutor's questions here asserted no facts. She sought to establish what Dr. Barnard had considered and had not considered to form her expert opinion. Her questions did not introduce hearsay or any type of testimonial hearsay. Also unlike in *Malik* and *Hardnett*, the prosecutor was well within the allowable scope of cross-examination of an *expert witness* when she sought to impeach the expert's opinion based on what the expert did not consider. A prosecutor may " 'challenge an expert by inquiring in good faith about relevant information, including hearsay, which he may have overlooked or ignored.' " (*Townsel, supra*, 63 Cal.4th at p. 56.) A prosecutor may do this without inquiring into testimonial hearsay statements contained in the overlooked source, as the prosecutor successfully did here. And in any event, Barnard testified without objection that she knew defendant had abused Shannon.

We thus conclude the cross-examination of Dr. Barnard did not violate defendant's Sixth Amendment right of confrontation.

III

*CALCRIM No. 851*

CALCRIM No. 851 limited the jury's consideration of Dr. Barnard's testimony. The instruction told the jury that it could consider Barnard's testimony about the effect of intimate partner battering "only in deciding whether the defendant actually believed he needed to defend himself against an immediate threat of great bodily injury or death, and whether that belief was reasonable or unreasonable." Defendant contends the instruction wrongfully restricted the jury from considering Barnard's testimony to gauge his credibility, assess his behavior, and decide whether he acted in the heat of passion.

Defendant did not object to CALCRIM No. 851 at trial. Indeed, defense counsel asked the trial court to give the instruction. Counsel also did not request the court to

33

modify the instruction. " 'A trial court has no sua sponte duty to revise or improve upon *an accurate statement of law* without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 336, italics added.)

Our determination of whether CALCRIM No. 851 is an accurate statement of the law effectively addresses defendant's arguments on its merits. Under Evidence Code section 1107, expert testimony is admissible "regarding intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence," subject to an exception not relevant here. (Evid. Code, § 1107, subd. (a).)

Despite CACLRIM No. 851's language that evidence of intimate partner battering could be considered only on deciding whether defendant believed he had to defend himself, courts have instructed juries that they could consider evidence of intimate partner battering for other issues. In *People v. Coffman & Marlow* (2004) 34 Cal.4th 1 (*Coffman*), the California Supreme Court affirmed the trial court's instructing that the jury could consider evidence of battered woman syndrome for determining whether the defendant had formed the mental state or specific intent required for the charged offenses or was acting under duress. (*Id*. at pp. 99-101.)

In *People v. Dowdell* (2014) 227 Cal.App.4th 1388, the trial court had instructed the jury with a combination of CALCRIM No. 851 and a CALJIC instruction and had limited the jury's use of intimate partner battering only for purposes of self-defense and duress. It did not allow the jury to consider the evidence for whether the defendant formed the specific intent to commit the charged offenses. (*Id*. at pp. 1416-1417.) The Court of Appeal ruled that the trial court had erred. Although the trial court had relied on CALCRIM No. 851, it had not applied the Judicial Counsel Bench Notes to CALCRIM No. 851, which cite to *Coffman* as follows: " 'The court may need to modify this instruction if the defense offers testimony on intimate partner battering and its effects on

34

an issue other than whether the defendant actually and reasonably believed in the need for self-defense. (See [*Coffman, supra,*] 34 Cal.4th [at pp.] 98-101 . . . [evidence offered to show defendant did not act with intent to kill but acted out of fear of codefendant].)' (Judicial Council of Cal., Crim. Jury Instns. (2013) Bench Notes to CALCRIM No. 851 (1st ed. 2013).)" (*Dowdell*, at p. 1419.)

And in *People v. Kovacich, supra*, 201 Cal.App.4th 863, a panel of this court ruled that expert testimony of intimate partner abuse was properly admitted for the jury to consider the credibility of statements made by the murdered abuse victim. (*Id*. at pp. 900-902.)

Assuming for purposes of argument that CALCRIM No. 851 is written too narrowly, we nonetheless find that no substantial evidence linked Dr. Barnard's testimony of intimate partner battering to the heat of passion element in voluntary manslaughter so as to support a modification to the form instruction. Barnard provided no evidence linking heat of passion to intimate partner battering. Rather, she stated that many people who experience intimate partner battering "behave in what we call hypervigilant kind of ways, or they have an increased sense of danger that maybe somebody wouldn't have who had not experienced prior abuse." These traits do not equate with acting rashly at the time of the act, without due deliberation, and under the influence of intense emotion that obscures reasoning or judgment—the elements of heat of passion. (*People v. Nelson* (2016) 1 Cal.5th 513, 538-539.)

Indeed, Dr. Barnard stated that victims of intimate partner battering develop "all kinds of coping skills. [They] try everything to try to make it stop or try to change the situation. They placate. They promise things. They go along with things. They try to change their behavior. They try to make sure . . . that whatever the abuser is demanding that they try to do those things to try to mitigate the abuse." This evidence suggests intimate partner battering typically does not contribute to a victim developing heat of

35

passion. The trial court thus did not err in instructing the jury with the form version of CALCRIM No. 851.

As to defendant's contention that CALCRIM No. 851 precluded the jury from considering Dr. Barnard's testimony to evaluate his credibility and behavior, we conclude the instruction had no such effect. By following the instruction and considering the evidence of intimate partner battering to determine whether defendant actually and reasonably believed he had to defend himself, the jury had to decide whether defendant's version of the incident was true, that he shot Shannon after she had doused him in gasoline and threatened to blow him up while holding a lighter. Following the instruction thus did not preclude the jury from considering defendant's credibility and behavior. Rather, it required the jury to consider defendant's credibility and behavior. The trial court thus did not err in instructing the jury with CALCRIM No. 851.

IV

*Cumulative Error*

Defendant contends that the errors he has alleged individually and cumulatively so infused the trial with unfairness as to deny him due process of law. We have found only one potential error, the exclusion of Shannon's statement to Rafael. But we have established that the error was not prejudicial. Because we have found no other individual errors, there can be no cumulative error. (*People v. Phillips* (2000) 22 Cal.4th 226, 244.)

V

*Sufficiency of Evidence of Prior Strikes*

Defendant's two prior strikes were convictions by plea in 2001 and 2008 for violating section 186.22, subdivision (a), participation in a criminal street gang. One of the offense's elements requires the defendant to have willfully done an act that promoted,

36

furthered, or assisted in any felonious criminal conduct by members of the gang. (§ 186.22, subd. (a).)

At the time defendant was convicted of these offenses, the participation element could be satisfied if the defendant acted alone. (*People v. Strike* (2020) 45 Cal.App.5th 143, 149 (*Strike*).) In 2012, however, the California Supreme Court ruled in *People v. Rodriguez* (2012) 55 Cal.4th 1125 (*Rodriguez*) that the element could be satisfied only if the defendant performed the wrongful act in concert with another gang member. (*Id.* at p. 1138.)

This change rendered a pre-*Rodriguez* conviction of gang participation inconclusive on its face as to whether it qualified as a strike post-*Rodriguez*. (*Strike, supra*, 45 Cal.App.5th at p. 150.) To prove the strike allegation, the prosecution could no longer simply rely on the fact that the defendant had been convicted of violating section 186.22, subdivision (a). "The prosecution had to prove defendant admitted [or committed] all of the elements of the offense as explained by *Rodriguez*, including that he committed a felony offense with another member of his gang." (*Ibid.*) A panel of this court reached the same conclusion in *People v. Farias* (2023) 92 Cal.App.5th 619, 645-648, review granted Sept. 27, 2023, S281027, when determining whether a pre-*Rodriguez* gang participation conviction qualified as a serious felony under section 667, subdivision (a), where the defendant committed the gang offense alone.

At the bifurcated trial on defendant's strike priors, the evidence did not contain the convictions' factual circumstances, and thus the evidence did not establish that defendant committed the wrongful acts for purposes of section 186.22, subdivision (a), with another gang member. Defendant contends that because the evidence of his prior strikes is insufficient, the true findings that he committed the strikes as alleged must be reversed and the matter remanded. We agree.

The Attorney General disagrees with defendant and raises the same arguments he raised in *Farias* against applying the rule of *Strike* to that situation. (*Farias, supra*,

92 Cal.App.5th at p. 648, review granted.) In general, he disagrees with *Strike's* holding that in proving the three strikes convictions at sentencing, the prosecution was required to show that the convictions satisfied all the elements of section 186.22, subdivision (a), as they were understood at the time of sentencing in this matter. He also contends that every felony conviction for a violation of section 186.22, subdivision (a), is by statute a strike, and thus defendant cannot challenge the sufficiency of his strikes without effectively challenging the sufficiency of the original convictions, something defendant cannot collaterally attack when those convictions are used for sentencing enhancements. We rejected these arguments in *Farias* and need not repeat our reasons here. (*Id*. at p. 648, review granted.)

We will remand this matter for retrial on the strike prior allegations.

VI

*Correction of Abstract of Judgment*

Defendant asks us to order the trial court to correct the abstract of judgment to reflect the court's waiver of restitution fines. The Attorney General asks that the abstract be corrected to reflect that the trial court sentenced defendant consecutively on counts 1 and 2.

A.   Restitution fines

At sentencing, the trial court ordered defendant to pay a $10,000 restitution fine pursuant to section 1202.4. The court imposed the fine because defendant "will be in prison for the remainder of his life and he is able-bodied and is able to get a job and to work in prison." The court also imposed and stayed "an identical fine, pursuant to the $10,000 fine . . . that will remain suspended, unless Defendant's parole is revoked."

Additionally, the trial court ordered defendant to make restitution to the victim's family via the California Victims Compensation Board in the amount of $7,500 pursuant to section 1202.4. It also ordered defendant to make restitution in amounts to be

38

determined to his two children, Chevron, Burger King, and two of the testifying witnesses.

At this point in the hearing, defense counsel said he wanted to make one remark about the fines and fees. When the trial court returned to counsel's request, the following colloquy took place:

"[THE COURT:] You had something you wanted to indicate about fines and fees, Mr. Buchholz?

"MR. BUCHHOLZ: Right. I just think it's appropriate that any income [defendant is] able to generate in prison be put towards restitution to the named victims, as opposed to a restitution fine, which goes to the state. So to that extent, whatever discretionary fines and fees the Court would waive would be the request.

"THE COURT: Okay. So the Court will also impose a $30 court facility fee and a $40 court security fee on each count, but the Court will waive all other fines and fees in this matter in addition to that."

The prosecutor did not object.

The abstract of judgment records that the court ordered defendant to pay a $10,000 restitution fine pursuant to section 1202.4, subdivision (b), and a $10,000 restitution fine pursuant to section 1202.45 that was suspended unless parole is revoked. Defendant contends the abstract is incorrect and must be amended to reflect the trial court's oral waiver of both restitution fines. Defendant also contends the Attorney General has forfeited any opposition by not objecting to the court's waiver.

In opposition, the Attorney General interprets the trial court's waiver as a statement that the court would not impose any other fines and fees beyond that which it had already imposed. The Attorney General argues that restitution fines under section 1202.4 are mandatory unless the trial court states compelling and extraordinary reasons on the record for not imposing them. (§ 1202.4, subd. (b).) The trial court made no statement on the record of compelling reasons for not imposing the fines. Instead, before

39

defense counsel's request, it explained why it would impose the fines. The Attorney General contends that the court's statement justifying the fines and the lack of a statement of compelling reasons not to impose the fine demonstrate that the court did not waive the restitution fines.

Although defense counsel argued that defendant's future income should be used to pay restitution to the victims instead of paying a fine to the state, counsel asked the trial court to waive "whatever discretionary fines and fees" the court would.

Restitution fines are not discretionary. They are mandatory unless the trial court finds compelling and extraordinary reasons for not imposing the fine and states those reasons on the record. (§ 1202.4, subd. (b).) The trial court did not state on the record any compelling and extraordinary reasons why it would not impose the restitution fines. Rather, responding to counsel's request to waive discretionary fines, the court stated it would waive "all other fines and fees" in this matter. The court thus did not waive the mandatory restitution fines.

Although restitution fines are mandatory the amount of those fines can range between $300 and $10,000. (§1202.4(b)(1).) The amount is left to the discretion of the trial court.

Given the above discussion between the court and counsel, we cannot be certain what the court's intention was in setting the amount of the restitution fine in light of its apparent concern that the victims be compensated for the harm caused by defendant. Under the circumstances, we think it is appropriate to interpret the court's restitution orders to be set in the amount of $300. The abstract of judgment shall be amended accordingly.

B.     Consecutive sentence

The Attorney General correctly asserts that the trial court ordered that the sentence on count 2 run consecutively to the sentence on count 1.  The abstract of judgment does not record the court's order.  We will order the abstract be corrected accordingly.

DISPOSITION

The trial court clerk is directed to file with the California Department of Corrections and Rehabilitation an amended abstract of judgment recording that defendant's sentence on count 2 is to run consecutively to his sentence on count 1.  The matter is remanded for retrial on all prior strike allegations alleged in the amended information pursuant to Penal Code sections 667, subdivisions (b)-(i), and 1170.12 in accordance with *People v. Strike, supra*, 45 Cal.App.5th 143, and *People v. Farias, supra*, 92 Cal.App.5th 619, review granted.  The restitution fines are set in the amount of $300 and the abstract of judgment shall be amended accordingly.  In all other respects, the judgment is affirmed.


_____
        HULL, Acting P. J.



We concur:



_____
MAURO, J.



_____
BOULWARE EURIE, J.

41